T.C. Memo. 2011-45

UNITED STATES TAX COURT

ENERGY RESEARCH AND GENERATION, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 4936-02, 1561-04.    Filed February 24, 2011.

<u>John M. Youngquist</u>, for petitioner.

<u>Daniel J. Parent</u> and <u>Kaelyn J. Romey</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, <u>Judge</u>:  In these consolidated cases, respondent
determined deficiencies in petitioner's Federal income taxes,

additions to tax pursuant to section 6651(a)(1),[1] and fraud

penalties[2] pursuant to sections 6653(b) and 6663 as follows:[3]

Docket No. 4936-02

| Year | Deficiency | Fraud Penalty Sec. 6653(b) |
|------|-----------|----------------------------|
| 1988 | $187,030 | $140,272.50 |

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Fraud Penalty Sec. 6663(a) |
|------|-----------|----------------------------------|----------------------------|
| 1989 | $355,725 | $89,162.00 | $266,793.75 |
| 1990 | 400,041 | 100,250.50 | 300,030.75 |
| 1991 | 870,725 | 217,681.25 | 653,043.75 |
| 1992 | 534,706 | 133,676.50 | 401,029.50 |

| Year | Deficiency | Fraud Penalty Sec. 6663(a) |
|------|-----------|----------------------------|
| 1993 | $382,865 | $287,148.75 |
| 1994 | 178,506 | 133,879.50 |

Docket No. 1561-04

| Year | Deficiency | Fraud Penalty Sec. 6663(a) |
|------|-----------|----------------------------|
| 1995 | $457,143 | $342,857.25 |

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]We use the term "fraud penalty(ies)" to include the addition to tax under sec. 6653(b) for 1988.

[3]As set forth in an amendment to answer, respondent seeks to increase the amounts of disallowed rent expenses for tax years 1990-94.  On brief respondent states that, because of concessions, the deficiencies and penalties will not exceed the amounts in the notices of deficiency.

The parties agree that the period of limitations for assessment has expired for each of the years 1988 through 1995 (years at issue) unless the Court finds that petitioner's returns were false or fraudulent with the intent to evade tax. See sec. 6501(c)(1).

If we find that petitioner's returns were fraudulent, most of the adjustments to petitioner's income are now agreed. Pursuant to the parties' stipulations and posttrial concessions in their briefs, all but two of the adjustments to income, deductions, and credits have been agreed. The following schedules show the agreed adjustments:

<u>1988</u>

| Adjustments to Taxable Income | Agreed Adjustment |
|---|---|
| Gross receipts | ($22,270) |
| Disallowed deductions: | |
| Legal & professional fees | 23,598 |
| Research & development | 24,601 |
| Employee relations | 467 |
| Auto expenses | 9,645 |
| Life insurance expenses | 2,425 |
| Tax and license expense | 311 |
| Rents | 29,400 |
| Salaries & cost of goods sold labor | 264,134 |
| Pension plan expense | 15,348 |
| Director's fees | 24,000 |
| Other payments | -0- |
| Accounting method for customer deposits | 86,000 |
| Employee benefits | (1,170) |
| Increased taxable income | 456,489 |

## 1989

| Adjustments to Taxable Income | Agreed Adjustment |
|---|---|
| Gross receipts | $318,507 |
| Disallowed deductions: | |
| Legal & professional fees | 138,484 |
| Research & development | 102,222 |
| Royalty | 248,098 |
| Employee relations | 1,347 |
| Auto expenses | 10,624 |
| Life insurance expenses | 2,404 |
| Tax and license expense | 7,909 |
| Rents | 29,400 |
| Salaries & cost of goods sold labor | 118,686 |
| Bad debts | 31,675 |
| Pension plan expense[1] | -- |
| Director's fees | 24,000 |
| Other payments | -0- |
| Janitorial expense | 5,980 |
| Contributions | -0- |
| Increased taxable income | 1,039,336 |
| | |
| Disallowed research & development credit | $5,515 |

[1]A $100,000 adjustment for pension plan expense is in dispute.

## 1990

| Adjustments to Taxable Income | Agreed Adjustment |
|---|---|
| Gross receipts | ($173,872) |
| Cost of goods sold (purchases & materials) | 26,387 |
| Disallowed deductions: | |
| Legal & professional fees | 49,652 |
| Research & development | 132,687 |
| Royalty | 193,508 |
| Employee relations | 7,139 |
| Auto expenses | 23,676 |
| Life insurance expenses | 2,480 |
| Tax and license expense | 34,147 |
| Rents | 61,308 |
| Salaries & cost of goods sold labor | 404,435 |
| Interest expense | 938 |
| Bad debts | 19,255 |
| Pension plan expense | 50,000 |
| Director's fees | 24,000 |

| | |
|---|---:|
| Compensation of officers | -0- |
| Other payments | -0- |
| Materials & supplies | (4,698) |
| Employee benefits | 10,930 |
| Janitorial expense | 7,239 |
| Repairs & maintenance | 3,567 |
| Contributions | (6,000) |
| Dues & subscriptions | (683) |
| Increased taxable income | 866,095 |
| | |
| Disallowed research & development credit | $5,693 |

## 1991

| Adjustments to Taxable Income | Agreed Adjustment |
|---|---:|
| Gross receipts | $459,833 |
| Cost of goods sold (purchases & materials) | (1,220) |
| Disallowed deductions: | |
| Legal & professional fees | 55,046 |
| Research & development | 169,137 |
| Royalty | 1,764,049 |
| Employee relations | 8,418 |
| Auto expenses | 12,706 |
| Life insurance expenses | 2,458 |
| Tax and license expense | 1,799 |
| Rents | 61,308 |
| Interest expense | 8,128 |
| Bad debts | 36,053 |
| Director's fees | 24,000 |
| Compensation of officers | -0- |
| Materials & supplies | 9,254 |
| Janitorial expense | 6,730 |
| Depreciation | (11) |
| Contributions | (13,200) |
| Dues & subscriptions | (2,027) |
| NOL carryback from 1993 | -- |
| Increased taxable income | 2,602,461 |
| | |
| Disallowed research & development credit | $7,256 |

## 1992

| Adjustments to Taxable Income | Agreed Adjustment |
|---|---:|
| Gross receipts | [1]$51,017 |
| Cost of goods sold (purchase & materials) | (11,212) |
| Disallowed deductions: | |

| | |
|---|---:|
| Legal & professional fees | 64,880 |
| Research & development | 136,045 |
| Royalty | 907,443 |
| Employee relations | 23,429 |
| Paid to Kent Greene | 7,634 |
| Auto expenses | 20,636 |
| Life insurance expenses | 2,590 |
| Tax and license expense | 21,057 |
| Rents | 80,400 |
| Interest expense | 9,051 |
| Bad debts | 84,455 |
| Pension plan expense | (2,792) |
| Director's fees | 36,000 |
| Compensation of officers | -0- |
| Other payments | -0- |
| Materials & supplies | 4,800 |
| Employee benefits | 25,446 |
| Janitorial expense | 6,760 |
| Repairs & maintenance | 15,280 |
| Depreciation | (303) |
| Contributions | (14,400) |
| Salaries & wages | (13,782) |
| Increased taxable income | 1,454,434 |

| | |
|---|---:|
| Disallowed research & development credit | $5,836 |

[1]Respondent's adjustment is $145,418 and petitioner has conceded $51,017; therefore, $94,401 is in dispute.

## 1993

| Adjustments to Taxable Income | Agreed Adjustment |
|---|---:|
| Gross receipts | $52,597 |
| Cost of goods sold (purchase & materials) | (3,959) |
| Disallowed deductions: | |
| Legal & professional fees | 85,560 |
| Research & development | 118,989 |
| Royalty | 220,000 |
| Employee relations | 4,255 |
| Paid to Kent Greene | 7,032 |
| Auto expenses | 28,303 |
| Life insurance expenses | 2,646 |
| Employee education expenses | 2,599 |
| Computer purchase | -0- |
| Tax and license expense | 24,546 |
| Rents | 105,086 |
| Salaries & cost of goods sold labor | 164,039 |

| | |
|---|---:|
| Interest expense | 9,436 |
| Bad debts | 3,377 |
| Pension plan expense | 28,027 |
| Director's fees | 36,000 |
| Mark Benson's medical expense | -0- |
| Compensation of officers | -0- |
| Employee benefits | 628 |
| Depreciation | (1,435) |
| Contributions | -0- |
| Dues & subscriptions | (76) |
| Increased taxable income | 887,650 |

## 1994

| Adjustments to Taxable Income | Agreed Adjustment |
|---|---:|
| Gross receipts | $1,559 |
| Disallowed deductions: | |
| Legal & professional fees | 167,237 |
| Research & development | 106,694 |
| Royalty | 160,063 |
| Employee relations | 10,630 |
| Auto expenses | 14,723 |
| Life insurance expenses | 4,779 |
| Employee education expenses | 7,269 |
| Tax and license expense | 14,960 |
| Rents | 102,360 |
| Salaries & cost of goods sold labor | 35,561 |
| Bad debts | 9,906 |
| Pension plan expense | (56,083) |
| Director's fees | 36,000 |
| Compensation of officers | -0- |
| Materials & supplies | 3,274 |
| Employee benefits | (3,310) |
| Maintenance & repair | (359) |
| Travel | 7,955 |
| Depreciation | (8,327) |
| Dues & subscriptions | 4,119 |
| Other deductions | 4,106 |
| Contributions | (20,000) |
| Increased taxable income | 603,116 |

## 1995

| Adjustments to Taxable Income | Agreed Adjustment |
|---|---:|
| Gross receipts | ($58,507) |
| Cost of goods sold (purchase & materials) | 114,568 |

Disallowed deductions:

| | |
|---|---:|
| Legal fees | 133,703 |
| Professional fees | 5,263 |
| Royalty | 260,160 |
| Engineering studies | 108,714 |
| Employee relations | 2,332 |
| Auto expenses | 8,455 |
| Life insurance expenses | 6,011 |
| Employee education expenses | 13,088 |
| Tax and license expense | 2,075 |
| Rents | 135,518 |
| Salaries | 145,620 |
| Bad debts | 11,343 |
| Director's fees | 36,857 |
| Compensation of officers | -0- |
| Supplies (including R & D) | 40,543 |
| Employee benefits | 30,199 |
| Janitorial expense | 584 |
| Depreciation | (10,677) |
| NOL deduction | 131,975 |
| Telephone expense | 2,149 |
| Business meetings | 666 |
| Contributions | (19,800) |
| Increased taxable income | 1,100,839 |

The issues we must decide are:

(1) Whether petitioner's returns for the years at issue were false or fraudulent with the intent to evade tax. If so, the periods of limitations for assessing tax remain open and petitioner is liable for fraud penalties pursuant to section 6653(b) for 1988 and section 6663(a) for 1989 through 1995;[4]

(2) whether petitioner is entitled to deduct $100,000 as a pension plan expense in 1989;

---

[4]Respondent alternatively asserts that petitioner is liable for an addition to tax under sec. 6651(f) for 1994 should we not find petitioner liable under sec. 6663(a).

(3) whether petitioner understated its gross receipts by $94,401 in 1992; and

(4) whether petitioner is liable for an addition to tax pursuant to section 6651(a)(1) for 1989 through 1992.

FINDINGS OF FACT

Even though most of the adjustments to petitioner's taxable income have been agreed, it is necessary to make fact findings regarding many of those adjustments because the factual basis for those adjustments is also the factual basis for respondent's allegations of fraud.  Some of the facts have been stipulated and are so found.  The stipulation of facts, the first and second supplemental stipulations of facts, and the stipulation of settled issues are incorporated herein by this reference.[5]  At the time the petitions were filed, petitioner's principal place of business was in California.

Background

Petitioner is a corporation incorporated in California in 1967 by Glendon M. Benson (Glendon), his wife, Janet Benson

---

[5]In Benson v. Commissioner, T.C. Memo. 2004-272, supplemented by T.C. Memo. 2006-55, affd. 560 F.3d 1133 (9th Cir. 2009), in which Burton O. Benson (Burton) was a petitioner, we made certain findings that the parties agree apply in this case.

(Janet), and Burton O. Benson (Burton),[6] Glendon's younger brother.

Petitioner is the only company in the world that manufactures various forms of foam metal and foam metal baffles.[7] Duane Walz and Glendon invented the process known as foam metal, which Glendon then developed into a product. Mr. Walz was given sole credit as the inventor of the patent and, on March 23, 1976, he assigned his patent rights to petitioner.

In the mid-1980s a dispute arose between Burton and Glendon over the operation and ownership of petitioner. On April 4, 1985, Burton and his wife, Elizabeth, filed suit against Glendon, Janet, and petitioner. In October 1985 Burton and Glendon executed an agreement delineating their respective responsibilities concerning contracts with two of petitioner's major clients, Hercules Aerospace Co., Inc. (Hercules),[8] and Gas Research Institute (GRI). Under the agreement, Burton was

---

[6]Burton has a degree in mechanical engineering from the University of Minnesota. He and his wife, Elizabeth Benson (Elizabeth), have three sons: Eric, Mark, and Brad. Esther V. Benson (Esther) was the mother of Burton and Glendon. Burton served 9 years as an officer in the U.S. Navy and 23 years as an officer in the U.S. Naval Reserve, retiring with the rank of Rear Admiral.

[7]Foam metal baffles are used in the U.S. Navy's fleet of ballistic missiles.

[8]Hercules Aerospace Co., Inc., and all predecessors and successors in interest will be referred to throughout this opinion as Hercules.

granted all rights to and responsibility for contracts with Hercules,[9] and Glendon was granted all rights to and responsibility for contracts with GRI.

In May 1986 Burton and Glendon initiated binding arbitration. On July 9, 1986, the arbitration panel issued an interim decision. In October 1986 Burton and Glendon entered into an agreement to adjourn the arbitration proceedings, choosing to mediate the dispute with the aid of Winston E. Miller (WEM) as mediator. On June 28, 1987, during the course of mediation, Burton and Glendon entered into an agreement entitled "Memorandum Re: Unbundling of ERG (June 24, 1987)". The unbundling agreement provided terms for petitioner to purchase Glendon's interest (stock) in petitioner with the result that Burton becomes the sole owner of petitioner. Burton and Glendon subsequently executed a document entitled "Supplemental Memorandum Re: Unbundling of ERG (December 4, 1987)". On December 5, 1987, Burton and Glendon executed a document entitled "Memorandum Re: Other Commitments made to WEM".[10]

In July 1987 Glendon started Aker Industries (Aker) in Oakland, California. Aker performs research and development

_____

[9]During the years at issue petitioner produced for Hercules the First Stage Baffle for the Trident II D-5 U.S. Navy Fleet Ballistic Missile Program.

[10]Except as noted to the contrary, we refer to the documents executed by Burton and Glendon during mediation collectively as the unbundling agreement.

contracts. During the years at issue neither Glendon nor Aker performed research or development for petitioner. Burton is not, and never has been, an owner, shareholder, employee, director, or officer of Aker.

Neither petitioner nor Burton paid Glendon for his interest in petitioner, and the brothers continued to fight over what, if anything, was due to Glendon. On March 23, 1993, Glendon and Janet filed a motion asking a California court to enforce the unbundling agreement as a settlement agreement. In response to a 1994 petition filed by Burton, the court ordered the parties to recommence arbitration. In 1994 arbitration proceedings recommenced. On June 7, 1995, a second interim arbitration decision was issued and, on November 8, 1996, a third interim arbitration decision was issued.

On March 5, 1999, a final arbitration decision was issued. The final arbitration decision comprehensively decided the issues between Burton and Glendon. The arbitrators held that Burton became the 100-percent owner of petitioner on July 1, 1987, and found, inter alia, that

> During the period from and after July 1, 1987, * * * [Burton]/* * * [petitioner]/* * * [New Process Industries, Inc.,] was extremely successful * * *. As a result, in the period from 1988 through 1996, * * * [Burton] and his family obtained in excess of $6,500,000 in salaries, director's fees and cash distributions from * * * [petitioner]/* * * [New Process Industries, Inc.].

- 13 -

   * * * from and after July 1, 1987, * * * [Burton]
had total control over both * * * [petitioner] and
* * * [New Process Industries, Inc.] * * *.

The arbitrators also found that Burton owed Glendon a gross
amount of $3,119,475 for Glendon's interest in petitioner.  The
arbitrators awarded property (the Lowell plant) at 952 57th
Street, Oakland, California, to Glendon/Aker, for which Burton
received a credit of $185,500.  Additionally, the arbitrators
found that Glendon/Aker should have paid New Process Industries,
Inc. (NPI),[11] rent for the Lowell plant at $2,000 per month from
July 1, 1987, to December 31, 1994, and $2,500 thereafter.
Accordingly, Burton was credited with $420,650 for the rent
payments plus interest.  The final arbitration decision awarded
Glendon a net $2,412,172 after credits and deductions.

---

[11]New Process Industries, Inc. (NPI), was a family-owned S
corporation, incorporated in Minnesota.  On its respective 1988
through 1995 tax returns, the Benson family's percentage of
ownership of NPI was reported as follows:

| | Year and Percentage Ownership | | | | | | | |
| Individual | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 |
| Burton | 66.7 | 66.7 | 66.7 | 66.7 | 50.0 | 66.7 | 50.0 | 50.0 |
| Esther | 33.3 | 33.3 | 33.3 | 33.3 | 50.0 | -- | -- | -- |
| Eric | -- | -- | -- | -- | -- | 11.1 | 16.7 | 16.7 |
| Mark | -- | -- | -- | -- | -- | 11.1 | 16.7 | 16.7 |
| Brad | -- | -- | -- | -- | -- | 11.1 | 16.7 | 16.7 |

Burton exercised almost sole control over management and
operations of NPI.

During the years at issue Burton was petitioner's president and director.[12]  Burton alone exercised almost sole control over petitioner's management and operations.  On each of petitioner's 1988 through 1994 Forms 1120, U.S. Corporation Income Tax Return (tax returns), Burton is listed on Schedule E, Compensation of Officers, as owning 100 percent of petitioner's common stock.  On petitioner's 1995 Schedule E, Burton is listed as owning 28 percent of petitioner's common stock and Elizabeth, Eric B. Benson (Eric), and Mark D. Benson (Mark), Burton and Elizabeth's sons, are listed as each owning 24 percent.

Tax Return Preparation

Tax Return Preparers

G.A. "Al" Piepho (Mr. Piepho) performed all of petitioner's bookkeeping and accounting up until his death on October 1, 1989.  Mr. Piepho prepared petitioner's 1987 tax return, which was filed on May 23, 1989.  Burton worked directly with Mr. Piepho and provided him the records from which he was to prepare petitioner's tax returns.

Edward J. Bradac, C.P.A. (Mr. Bradac), purchased Mr. Piepho's accounting business.  For tax years 1988 through 1993, Mr. Bradac prepared petitioner's tax returns.  In 1995 Mr. Bradac

---

[12]Burton joined petitioner in 1969 in the capacity of vice president.  Before working for petitioner, Burton was an assistant program manager at Westinghouse, where it was his responsibility to check and ensure that the accounting was being done correctly.

became associated with Armstrong, Gilmour & Associates (Armstrong) and prepared petitioner's 1994 tax return. Petitioner's 1995 tax return was prepared by Jill Toibin, C.P.A. (Ms. Toibin), who was Mr. Bradac's manager at Armstrong.

Books and Records

Burton supervised petitioner's general bookkeeping, accounts receivable, accounts payable, sales, and purchases. Petitioner kept sales, invoice, and check registers. The sales, invoice, and check registers were not provided to Mr. Bradac or Ms. Toibin for the preparation of petitioner's 1988 through 1995 tax returns. Instead, Burton prepared summary/data sheets from the information in the registers and provided the summary/data sheets to the return preparer.

Burton understood income taxes, and he frequently asked petitioner's accountants tax questions or discussed tax planning or tax return preparation. Burton responded to any questions the return preparers had about any of the entries on the summary/data sheets. However, Burton's responses generally did not include providing the return preparers with any of the underlying documentation used in preparing the summary/data sheets.

Filing the Tax Returns

Most of petitioner's tax returns for the years at issue were not timely prepared or filed. The dates on which Burton first provided the summary/data sheets to petitioner's return preparers

and the dates on which petitioner's returns were filed are as follows:

| Year | Summary Provided to Preparer | Return Filed |
|------|------------------------------|--------------|
| 1988 | 7/94 | 8/1/94 |
| 1989 | 8/1/94 | 8/8/94 |
| 1990 | 8/27/94 | 11/20/94 |
| 1991 | 1/26/95 | 7/16/95 |
| 1992 | 2/9/95 | 7/16/95 |
| 1993 | 9/13/94 | 9/18/94 |
| 1994 | 9/15/95 | 9/15/95 |
| 1995 | 9/4/96 | 9/16/96 |

## Respondent's Initial Examination

Respondent sent to petitioner a letter dated June 9, 1991, inquiring as to petitioner's unfiled 1988 tax return. On August 23, 1995, respondent's revenue agent contacted petitioner's president, Burton, by telephone regarding petitioner's 1993 tax return. On January 8, 1996, petitioner's case was assigned to respondent's revenue agent Theresa Martin (Revenue Agent Martin). The initial appointment was rescheduled several times.

On May 8, 1996, Revenue Agent Martin met with Burton and Mr. Bradac at Mr. Bradac's office and reviewed information and documents. At this meeting Revenue Agent Martin was provided schedules of expenses for 1993 and copies of invoices for "royalties", "research and development", and "engineering services". The examination was subsequently expanded to include the other years at issue. During the examination petitioner did not provide respondent with copies of its invoice or check

registers for 1988 through 1995. Petitioner first provided the invoice and check registers for 1988 through 1995 to respondent in February and March 2008.

During the examination Revenue Agent Martin requested the corporate minutes and was told that there were no corporate minutes. At trial petitioner offered into evidence documents which petitioner's president testified were contemporaneously kept corporate minutes.

### Gross Receipts

Respondent conducted a bank deposits analysis to determine whether petitioner correctly reported its gross receipts. The parties agree to the bank deposits analysis, except for the inclusion of a $94,401 deposit on March 27, 1992, into petitioner's Merrill Lynch account #XXX-X7888. For tax years 1989, 1991, 1993, and 1994 petitioner understated its gross receipts by $318,507, $459,833, $52,606, and $1,559, respectively. Petitioner also understated its gross receipts by at least $51,017 in 1992. Petitioner overstated its gross receipts or sales by $22,270, $173,872, and $58,507 in 1988, 1990, and 1995, respectively. Thus, for the 8 consecutive years at issue in this case, petitioner understated its gross receipts or sales by at least $628,873 ($883,522 in understatements less $254,649 in overstatements). Gross receipts reported on

petitioner's tax returns were based on the summary/data sheets prepared by Burton and given to the return preparers.

Rent

During the years at issue NPI owned the Lowell plant and property at 900-960-962-964 Stanford Avenue, Oakland, California (the Stanford plant).  Petitioner deducted the rent payments it made to NPI for both the Lowell plant and the Stanford plant on its tax returns as follows:  $91,308 in 1988; $91,308 in 1989; $127,308 in 1990; $127,308 in 1991; $146,400 in 1992; $171,086 in 1993; $168,360 in 1994; and $201,518 in 1995.  Petitioner conducted its foam metal and manufacturing operations from the Stanford plant before and after July 1, 1987.  For years 1988 and 1989, petitioner paid $5,159 per month to NPI for the use of the Stanford plant.  The monthly rent expense remained unchanged until August 15, 1990, when petitioner paid $26,159 to NPI.  For the remaining 4 months of 1990, petitioner made rent payments of $8,159, $8,159, $14,159, and $8,159, respectively.  In 1993 and 1994 petitioner paid to NPI $9,380 and $10,787 per month, respectively.  Petitioner made 1 monthly payment of $10,787 and 11 monthly payments of $12,405 to NPI for tax year 1995.

The 1989 unbundling agreement provided that the Stanford plant would be leased for a term of 8 years at "$5,000 (or $5,500 per month)".  The maximum monthly lease amount listed in the unbundling agreement reflected the product of an arm's-length

negotiation.  The rent petitioner paid for the Stanford plant in excess of $5,500 per month was a constructive dividend to Burton that petitioner was not entitled to deduct.

The Lowell plant was used by Glendon and Aker.  In the unbundling agreement Glendon and Burton agreed to enter into an 8-year lease with respect to the Lowell plant, which was to provide that Glendon would pay $2,000 per month to NPI.  In 1988 a confirming commercial lease was prepared but not executed. This lease agreement was for a term of 8 years to commence in March 1988 and provided that Aker pay rent of $2,000 per month. During the years at issue neither Glendon nor Aker paid rent to NPI for the use of the Lowell plant.  Instead, petitioner paid rent to NPI on behalf of Glendon/Aker.

Petitioner had no contractual obligation to pay rent to NPI for Glendon's/Aker's use of the Lowell plant.  It was Aker's responsibility to pay NPI for the use of the Lowell plant, which Glendon ultimately paid by virtue of the final arbitration decision.  The rent petitioner paid to NPI was a constructive dividend to Burton that petitioner was not entitled to deduct.

Legal and Professional Fees

During the years at issue petitioner deducted legal and professional fees that were properly disallowed as deductions.

Among these deductions was a $96,749 legal fee paid to Michael B. Carroll (Mr. Carroll) for advice and services as an

advocate for Burton concerning ownership and control of petitioner and NPI. Mr. Carroll's representation involved a personal and noncorporate matter between Glendon and Burton. On May 19, 1989, petitioner issued a $96,749 check to Burton, and Burton deposited the check. On or about May 23, 1989, Burton purchased a $97,467.21 cashier's check made payable to Mr. Carroll. On its 1989 tax return, petitioner claimed a $96,749 deduction for legal fees paid to Mr. Carroll. Burton also claimed the $96,749 as a deduction in computing his 1989 Federal income tax liability. The $96,749 petitioner paid was a constructive dividend to Burton that petitioner was not entitled to deduct.

### Royalties and Engineering Services

During the years 1988, 1993, and 1994 petitioner transferred significant amounts of money to NPI as follows:

| Date Transferred | Amount |
|---|---|
| 12/30/88 | $180,000 |
| 4/15/93 | 750,000 |
| 4/15/93 | 190,000 |
| 4/20/93 | 2,060,000 |
| 12/30/93 | 600,000 |
| 4/15/94 | 129,414 |
| 6/17/94 | 30,649 |
| Total | 3,940,063 |

Burton's goal was to limit petitioner's reported profits. The plan to achieve this goal was put in place in 1993 and Burton caused petitioner to transfer most of the money in 1993.

Burton's goal was to have petitioner show a paper profit of approximately $75,000 per year.

On its 1989 through 1995 tax returns, petitioner claimed deductions for royalties expense and engineering services as follows:

| Year | Amount | Classification |
|------|--------|----------------|
| 1989 | [1]$252,679 | Royalty expense |
| 1990 | 193,508 | Royalty expense |
| 1991 | 1,764,049 | Royalty expense |
| 1992 | 907,443 | Royalty expense |
| 1993 | 220,000 | Royalty expense |
| 1994 | 160,063 | Royalty expense |
| 1995 | 260,160 | Royalty expense |
| 1995 | 108,714 | Engineering services |
| Total | 3,866,616 | |

[1]In the notice of deficiency for 1989, respondent disallowed $248,098 of the claimed $252,679 as a royalty expense. As previously noted the parties now agree to respondent's adjustment.

Since most of petitioner's payments to NPI were made after the claimed royalties were supposedly earned the deductions on petitioner's tax returns have little, if any, correlation to when the funds were transferred to NPI.

The royalty deductions were based on a purported licensing agreement between petitioner and NPI. The purported licensing agreement to pay royalties to NPI was merely a tax planning tool, completely lacking in economic substance. Burton, however, told Mr. Bradac that the purported licensing agreement was legally enforceable.

During the years at issue there was no written agreement between petitioner and NPI relating to engineering, design, or management services, and NPI did not perform any engineering work for petitioner or provide any services to petitioner. NPI did not treat anyone as an employee, did not issue any Forms 1099, and did not file any Forms 941, Employer's Quarterly Federal Tax Return. The label "engineering services" was created to achieve Burton's goal of having petitioner show profits of approximately $75,000.

At a May 8, 1996, meeting, petitioner provided Revenue Agent Martin with royalty invoices and engineering services invoices in support of its claim that during 1993 it paid $224,023 to NPI as royalties and $220,000 as engineering services. These invoices were on NPI letterhead, addressed to petitioner, showed amount "due", and were dated and stamped as "RECEIVED" in 1993. The NPI letterhead shows NPI's address in Minneapolis, Minnesota. Burton created and backdated these royalty and engineering services invoices shortly before the May 8, 1996, meeting. Burton did not inform Revenue Agent Martin that he created the royalty and engineering invoices in preparation for his meeting with her. Mr. Bradac first saw the royalty and engineering services invoices on May 8, 1996, shortly before they were provided to Revenue Agent Martin. Burton did not inform Mr. Bradac that he

had just created the invoices for the meeting with Revenue Agent Martin.

In February 1998 Burton told respondent's agents that he always computed the royalties each month and he always made the invoice each month for royalties and then gave it to his secretary. However, the only year for which petitioner provided the examining agent invoices for royalties or engineering services was 1993. In late 1999 or early 2000 Burton finally acknowledged to respondent's agents that the NPI invoices that he had provided were created in 1996 and backdated to 1993.

The purported royalty and engineering services payments that petitioner transferred to NPI were used for Burton's and his family's economic benefit and constituted constructive dividends to Burton in the year of transfer. Petitioner was not entitled to any of the claimed deductions for royalty and engineering services purportedly provided by NPI.

### Payments to Cox Construction and to Kent Greene

In 1992 Burton and Cox Construction entered into a contract to remodel a recreation room in Burton's residence. The contract provided, inter alia, that "Mr. Benson may furnish a maintenance man from his plant to help with the framing." Burton provided petitioner's maintenance man, Kent Greene (Mr. Greene), to assist in the remodel of his residence. On its 1992 tax return petitioner improperly deducted a $15,280 "repair and maintenance

expense" that it paid to Cox Construction.  On its 1992 and 1993 tax returns petitioner improperly deducted salaries and labor expenses of $7,634 and $7,032, respectively, which it paid to Mr. Greene.

Employee Education Expense

On its 1993 and 1994 tax returns, petitioner improperly deducted employee education expenses of $2,599 and $7,269, respectively, for payments made to Oregon State University, Corvallis, Oregon (OSU).  On its 1995 tax return, petitioner deducted employee education expenses of $13,334.  Petitioner's 1995 ledger reflects payments made as follows:

| Date Paid | Check | Payee | Amount |
|-----------|-------|-------|--------|
| 1/9/95 | 25588 | OSU | $3,129 |
| 3/25/95 | 25840 | Linn-Benton College Albany, Oregon | 128 |
| 4/24/95 | 25886 | OSU | 200 |
| 4/25/95 | 25921 | OSU | 2,812 |
| 10/1/95 | 26345 | OSU | 3,422 |
| 10/4/95 | 26349 | OSU | 3,397 |
| Subtotal | | | 13,088 |
| | | Burt Hutchinson | 73 |
| | | Drexel University | 135 |
| | | Don Holleran | 38 |
| Total | | | [1]13,334 |

[1]Of the amount claimed in 1995, respondent allowed $246 of employee education expense for the payments to Burt Hutchinson, Drexel University, and Don Holleran.

The payments made to OSU were for college tuition, fees, and books for Burton's son Eric during 1993, 1994, and for Burton's sons Eric and Mark in 1995.

Petitioner produced letters dated June 12, 1993, and June 12, 1995, indicating that Eric and Mark, respectively, were selected from a vast field of applicants for the "ERG Management Training Program"; however, neither Eric nor Mark was selected from a "vast field" of applicants for the scholarship. In fact, petitioner's awarding of "scholarships" coincided with Burton's three sons' turning 18 or 19 years old and starting college. Neither Eric nor Mark received a salary from petitioner before receiving the purported scholarship from petitioner.

Automobile and Truck Deductions

During the years at issue petitioner improperly deducted automobile and truck expenses, including Department of Motor Vehicle fees, insurance, gasoline, and repairs for automobiles used by Burton's family (the Bensons). The Bensons were authorized signators on a First Interstate checking account, which was used exclusively to pay for gasoline purchases through Interlink bank debit card(s) linked to that account. Petitioner paid and deducted $1,853 in 1990, $3,327.85 in 1991, $3,995.08 in 1992, $4,194.09 in 1993, $4,383.16 in 1994, and $3,875.32 in 1995 for gasoline purchases. On its respective 1990 and 1993 tax returns, petitioner improperly deducted the purchase of a $15,000 Jeep for Eric, and a $13,500 Ford Bronco for Mark.

Burton provided Mr. Bradac with the amounts of petitioner's automobile expenses for 1988 through 1993. When Mr. Bradac

questioned Burton as to how the automobile expenses were calculated and what they represented, Burton responded: "LEAVE AS IS." When Mr. Bradac prepared petitioner's 1988 through 1993 tax returns, he did not know that petitioner had purchased the vehicles for Eric and Mark.

### Director's Fees

During 1988 through 1995 petitioner improperly deducted payments it made to Elizabeth, Esther, Eric, and Mark as director's fees. Petitioner did not file a Form 1099 (or other information return) with respondent reporting that it paid director's fees to Elizabeth, Esther, Eric, or Mark. During the years at issue, petitioner made the following payments, which it deducted as director's fees:

| Individual | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 |
|---|---|---|---|---|---|---|---|---|
| Elizabeth | -0- | $3,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $16,260 |
| Esther | -0- | 3,000 | 12,000 | 12,000 | 12,000 | 12,000 | 9,000 | -- |
| Eric | -- | -- | -- | -- | 6,000 | 12,000 | 12,000 | 12,000 |
| Mark | -- | -- | -- | -- | -- | -- | 5,000 | 12,000 |

Petitioner concedes that it is not entitled to deduct the director's fees claimed on its 1988 through 1995 tax returns. This is another instance where Burton had petitioner pay and improperly deduct personal expenditures.

### Life Insurance

In 1969 Burton applied for a $100,000 life insurance policy with Massachusetts Mutual Life Insurance Co. (MassMutual). MassMutual issued policy number XXX6416 to Burton, the insured

and owner of the policy, and during the years at issue his wife Elizabeth was the primary beneficiary. For each of the years at issue, petitioner paid and claimed a deduction for payments made to MassMutual for a policy on Burton's life. In a memorandum sent to Burton, dated September 14, 1995, Mr. Bradac asked: "What is included in insurance. Life insurance is not deductible." In a handwritten note Burton responded that there was "NO LIFE".

In May 1996 Revenue Agent Martin asked Burton who the beneficiary of the life insurance policy was. On October 7, 1996, petitioner's representative provided Revenue Agent Martin with a letter dated October 2, 1996, on petitioner's letterhead addressed to MassMutual, which indicated that in a telephone conversation between Burton and a customer service representative it had been confirmed that petitioner was the beneficiary of the life insurance policy. On December 16, 1996, respondent's examining agent was given a letter dated December 2, 1996, from MassMutual indicating that petitioner was the current beneficiary of the life insurance policy; the letter did not indicate who the beneficiary was during the years at issue. On February 18, 1997, Revenue Agent Martin issued a summons to MassMutual and on March 11, 1997, MassMutual produced numerous documents including a copy of a "Change of Beneficiary with Proceeds Paid in One Sum" dated October 25, 1996, wherein Burton had changed the beneficiary of

the life insurance policy to petitioner effective November 1, 1996. During the examination process, neither Burton nor any other of petitioner's representatives disclosed to respondent's agents that petitioner was not the primary beneficiary of the MassMutual life insurance policy during the years at issue.

1994 Travel Expenses

Burton's mother Esther passed away September 3, 1994, and funeral services were held in Minnesota. On or about October 4, 1994, petitioner paid $833.06 for travel expenses incurred on behalf of Pastor Leroy M. Nelson, Burton's cousin. Pastor Nelson presided over Esther's funeral services.

During 1994 Eric attended college at OSU, in Corvallis, Oregon. On or about February 9, 1994, Burton signed a travel expense report indicating that he spent $286.95 on behalf of petitioner for travel to Corvallis, Oregon. In 1994 charges were made to a credit card issued for petitioner's BankAmericard account as follows:

| Date | Description | Amount |
|------|-------------|--------|
| 2/5/94 | Grand Manor Inn #35 Corvallis, OR | $223.82 |
| 2/3-6/94 | Hertz/fuel/parking | 105.70 |
| 5/10/94 | Hertz Rent-A-Car, St. Paul, MN | 91.61 |
| 5/10/94 | Radisson Hotels, Minneapolis, MN | 227.32 |
| 5/13/94 | Ramada Inns Falls Church, VA | 342.17 |
| 5/13/94 | Hertz Rent-A-Car Washington, D.C. | 137.46 |

| 9/10/94 | Lowell Inn | 1,542.79 |
| | Lake Elmo, MN | |
| 9/11/94 | Super America 4454 | 9.23 |
| | Bloomington, MN | |
| 9/11/94 | Hertz Rent-A-Car | 89.90 |
| | St. Paul, MN | |
| Total | | 2,770.00 |

On its 1994 tax return, petitioner improperly claimed deductions for these travel expenses, which petitioner now agrees are not deductible.

Property Taxes

In June 1990 petitioner purchased real property in Orinda, California (Orinda property), for $335,000.[13]  Title to the Orinda property was put in the name of "Burton O. Benson, Trustee" of petitioner's retirement trust.  Petitioner's retirement trust neither paid for the purchase nor reflected the Orinda property as an asset on any tax return or financial statement.

Petitioner's purchase of the Orinda property occurred at approximately the same time that Burton and Elizabeth purchased a vacant lot between their home and the Orinda property.  With petitioner's purchase of the Orinda property, Burton and Elizabeth had effectively acquired a large, uninterrupted piece of land behind and abutting their residence.  On October 28, 1997, Burton, acting as trustee of petitioner's retirement trust,

---

[13]The price paid inclusive of fees and taxes was $336,410.72.

deeded the Orinda property to Burton and Elizabeth, as husband and wife. The deed shows no consideration for the transfer of property and, in a handwritten note, describes the transfer as a "Gift to spouse".

Petitioner's payment in 1990 for the acquisition of the Orinda property and petitioner's payment of property taxes on the Orinda property were constructive dividends to Burton. On its tax returns, petitioner improperly deducted property taxes paid on the Orinda property as follows: $4,363 in 1991; $3,796 in 1992; $3,879 in 1993; $8,196 in 1994; and $2,075 in 1995.

Research and Development Expenses and Credits

On or about March 9, 1989, petitioner opened Money Fund account No. XXXXXXX9082 with Franklin Funds under the name of "R & D Division, ERG Inc." and used petitioner's tax identification number, 94-XXXX686. From 1989 through 1995 Burton was the only person who had signature authorization over the account.

From March 1989 through January 1995 Burton wrote checks made payable to "R & D Division, ERG, Inc."; "Aker Industries, Inc.--R & D Division"; "Aker Industries R & D Division"; or "R & D Division, Aker Industries, Inc." These checks were written on petitioner's Bank of America account, and deposited into petitioner's Franklin Funds "R & D Division, ERG Inc." account. Burton handwrote the endorsement "Aker Industries" on

the back of each check made payable to Aker Industries which was deposited into the Franklin "R & D Division ERC Inc." account. Between 1989 and 1995 over $700,000 was accumulated in the Franklin Funds "R & D Division, ERG Inc." account in the above described manner.

During the years at issue neither Aker nor Glendon provided any research and development services for petitioner and did not issue invoices to petitioner. Glendon had no knowledge of the Franklin Funds account.

On its tax returns for 1988 through 1994, petitioner improperly deducted research and development expenses of $24,601 in 1988; $102,222 in 1989; $132,687 in 1990; $169,137 in 1991; 136,045 in 1992; 118,989 in 1993; and $106,694 in 1994. Petitioner also deposited a $3,865 check made payable to "R & D Division, Aker Industries Inc." into the Franklin Funds "R & D Division, ERG Inc." account and improperly claimed a deduction for it as part of a supplies expense on its 1995 tax return.

In a confirmation letter dated July 11, 1995, sent to Burton regarding the preparation of petitioner's 1988 through 1993 tax returns, Mr. Bradac wrote, in pertinent part:

> Research and Development expenses: The research and development expense shown on your summary is for qualified research costs. Qualified research is limited to scientific experimentation or engineering activities designed to aid in the development of a new or improved product, process, technique, formula, invention or computer software program held for sale,

> lease, or license, or used by you in a trade or business. All research was conducted in the state of California.

Mr. Bradac was not aware of the fact that neither Aker nor Glendon had provided any services to petitioner and was unaware of petitioner's Franklin Funds "R & D Division ERG Inc." account until after the examination of petitioner's 1993 tax year had begun.

At the May 8, 1996, meeting with Revenue Agent Martin, Burton provided her with research and development invoices for tax year 1993. These research and development invoices are on Aker letterhead and were provided to agent Martin to support that the research and development deductions claimed on petitioner's 1993 tax return were for expenses paid to Aker. The research and development invoices are dated and stamped as "RECEIVED" by petitioner in 1993. Burton created these research and development invoices shortly before the May 8, 1996, meeting to substantiate the improper deductions. Mr. Bradac saw the fabricated research and development invoices for the first time approximately 5 minutes before the initial meeting with Revenue Agent Martin on May 8, 1996.

Petitioner also improperly claimed research and development credits as follows: $5,515 in 1989, $5,693 in 1990, $7,256 in 1991, and $5,836 in 1992. While preparing petitioner's tax returns, Mr. Bradac informed Burton of the requirements to

qualify for the research and development credit. Nevertheless, Burton told Mr. Bradac that petitioner's purported research and development payments qualified for the research and development credit. On August 2 and November 11, 1994, Burton sent (via facsimile) memorandums to Mr. Bradac to inform him not to forget the research and development tax credit.

Concealed Bank Accounts/Checks

In an information document request (IDR) dated August 23, 1995, respondent requested "Bank statements, reconciliations and cancelled checks for all corporate accounts for the period beginning December 1, 1992 and ending January 31, 1994." On May 8, 1996, petitioner provided bank statements and canceled checks for petitioner's accounts at Bank of America and Merrill Lynch but did not disclose or provide statements for its accounts with Franklin Funds.

In an IDR dated August 19, 1996, respondent requested "Bank statements, reconciliations and cancelled checks for all corporate accounts for the period beginning January 1994 and ending January 1995." On October 7, 1996, petitioner provided bank statements and most canceled checks for petitioner's accounts at Bank of America and Merrill Lynch but did not disclose or provide statements for its accounts with Franklin Funds.

In an IDR dated October 10, 1996, respondent requested 18 missing checks as follows:  "Cancelled checks shown on bank statements for Bank of America account XXX-X8267 but not included with the statements on 10-07-96".  On December 16, 1996, petitioner provided respondent with 12 checks made payable to "R & D Division, Aker Industries, Inc."

In December 1996 respondent requested bank statements and canceled checks for the period 1988 through 1992.  On January 29, 1997, petitioner provided statements and most canceled checks for petitioner's accounts at Bank of America and Merrill Lynch but did not disclose or provide statements for its accounts with Franklin Funds.

After comparing canceled checks to the Bank of America statements, Revenue Agent Martin determined that 12 canceled checks were missing for 1989.  Respondent issued summonses to Bank of America and to Merrill Lynch requesting petitioner's bank records for the years at issue.  Bank of America and Merrill Lynch complied with the summonses to the extent that records existed.  Bank of America provided copies of the 12 missing checks for 1989.  Eleven of the checks were made payable to Aker and one $33,328 check was made payable to "cash".

On February 6, 1997, respondent issued two summonses to Franklin Funds.  One summons was in the matter of "Energy Research and Generation, Inc.", and the other summons was in the

matter of "R & D Division E.R.G. Aker Industries, Inc. Trust". The Franklin Funds legal department received the summonses, and they were forwarded to a loss prevention specialist who began retrieving the documents. On February 19, 1997, Burton called Franklin Funds and indicated that he thought the accounts did not fall within the scope of the summons. On February 21, 1997, Franklin Funds issued a "Certificate of No Records" which stated that "no records exist pertaining to securities in the name of or for the benefit of Energy Research and Generation, Inc. under tax identification number 94-XXXX686." On February 27, 1997, respondent issued a summons to Franklin Funds requesting the signature card for the account in which the checks made payable to "R & D Division Aker Industries" had been deposited. On or about March 10, 1997, Franklin Funds provided the account application to respondent. The account application was signed by Burton as president of petitioner and the tax identification number on the account was petitioner's.

On April 14, 1997, respondent issued additional summonses to Franklin Funds, which, in turn, provided copies of account statements and deposited items. When Revenue Agent Martin received the Franklin Funds account information she learned for the first time that the account--where the checks payable to "R & D Division, Aker Industries" were deposited--was owned by petitioner, was under petitioner's tax identification number, and

Burton, as petitioner's president, was the only individual with signature authority over the account.

Revenue Agent Martin also learned for the first time that petitioner maintained a second account with Franklin Funds, the ERG-Recreation Fund. During the years at issue Burton was the only person with signature authorization over the ERG-Recreation Fund.

During the years at issue $87,102 was deposited into the ERG-Recreation Fund account. Checks written on the ERG-Recreation Fund account were often for the benefit of Burton and his family and were constructive dividends to Burton.

OPINION

A. The Statute of Limitations

The parties agree that the periods for assessing tax for the years at issue have expired unless petitioner's returns were fraudulent. Generally, the Commissioner must assess any tax within 3 years after a return is filed. See sec. 6501(a). An exception to the "3-year rule" is provided in section 6501(c). Section 6501(c), in pertinent part, provides:

SEC. 6501(c). Exceptions.--

(1) False return.--In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.

Fraud is defined as an intentional wrongdoing on the part of the taxpayer designed to evade tax believed to be owing. Neely v. Commissioner, 116 T.C. 79, 86 (2001) (citing Edelson v. Commissioner, 829 F.2d 828, 833 (9th Cir. 1987), affg. T.C. Memo. 1986-223, and McGee v. Commissioner, 61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975)). The existence of fraud is a question of fact to be resolved from the entire record. DiLeo v. Commissioner, 96 T.C. 858, 874 (1991), affd. 959 F.2d 16 (2d Cir. 1992).

A corporation acts through its officers, and corporate fraud necessarily depends upon the fraudulent intent of a corporate officer. DiLeo v. Commissioner, supra at 875 (citing Auerbach Shoe Co. v. Commissioner, 216 F.2d 693 (1st Cir. 1954), affg. 21 T.C. 191 (1953), Currier v. United States, 166 F.2d 346 (1st Cir. 1948), and Federbush v. Commissioner, 34 T.C. 740, 749 (1960), affd. 325 F.2d 1 (2d Cir. 1963)).

Respondent bears the burden of proving fraud by clear and convincing evidence. See sec. 7454(a); Rule 142(b); DiLeo v. Commissioner, supra at 873. Respondent must establish both that (1) petitioner has underpaid its taxes for each year; and (2) some part of the underpayment is due to fraud. DiLeo v. Commissioner, supra at 873 (citing Hebrank v. Commissioner, 81 T.C. 640, 642 (1983)).

The undisputed facts show that petitioner substantially underpaid its taxes for each of the years at issue, and we find that respondent has met his burden of proof with respect to the first prong of the fraud test. We must now decide whether petitioner filed its tax returns with the specific willful intent to evade taxes.

Any conduct, the likely effect of which would be to mislead, conceal, or otherwise prevent the collection of taxes may establish an affirmative act of evasion. See DiLeo v. Commissioner, supra at 874; see also Spies v. United States, 317 U.S. 492, 499 (1943). The taxpayer's entire course of conduct can be indicative of fraud. DiLeo v. Commissioner, supra at 874. Because fraudulent intent is rarely established by direct evidence, fraud may be inferred from various kinds of circumstantial evidence. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601. Circumstantial evidence tending to indicate that an underpayment of tax is due to fraud has often been referred to as "indicia of fraud" and generally includes: (1) Understatement of income; (2) inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealing assets; and (6) failure to cooperate with tax authorities. Id. Although no single factor is necessarily sufficient to establish fraud, the existence of several of these indicia is persuasive

circumstantial evidence of fraud.  <u>Petzoldt v. Commissioner</u>, 92
T.C. 661, 700 (1989).

    1.  <u>Understatement of Income</u>

    The evidence clearly establishes that petitioner
substantially understated its taxable income in each of the years
at issue.  The understatements of income are the result of both
understated gross receipts and overstated costs of goods sold and
expenses.

    Gross receipts reported on petitioner's tax returns were
based on summary/data sheets prepared by Burton and given to the
return preparers.  The underlying corporate records were not
provided to the return preparers.  In the light of respondent's
bank deposits analysis, petitioner now concedes that its gross
receipts were understated in tax years 1989, 1991, 1992, 1993,
and 1994, with the exception of a $94,401 deposit in 1992.  The
bank deposits method of reconstruction has long been sanctioned
by the courts.  <u>Clayton v. Commissioner</u>, 102 T.C. 632, 645
(1994); <u>Estate of Mason v. Commissioner</u>, 64 T.C. 651, 657 (1975),
affd. 566 F.2d 2 (6th Cir. 1977).  For the 8 years at issue
petitioner understated its gross receipts by at least $628,000.
Petitioner has offered no explanation for these understatements
of gross receipts.

    The evidence also shows that petitioner claimed substantial
improper deductions in each of the years at issue.  For the 8

years at issue petitioner has agreed to the disallowance of at least $8.5 million in improperly deducted expenses. The most egregious of the improper deductions were for the fabricated research and development expenses and the fabricated royalty and engineering services expenses paid to NPI.

The research and development expenses were allegedly paid to Aker but were actually deposited into an undisclosed bank account controlled by petitioner and its principal officer, who knew that Aker never performed any research and development services for petitioner during the years at issue. These phony research and development deductions exceed $790,000 during the years at issue.

The fabricated royalty and engineering services expenses were paid to NPI, which was a separate entity controlled by Burton. The purported royalties and engineering services were fabrications intended to reduce petitioner's reported income to a range that was acceptable to petitioner's principal officer, who was also the personal beneficiary of the payments to NPI. These transfers and improper deductions were as follows:

| Year | Amount Transferred | Amount Deducted |
|------|-------------------|-----------------|
| 1989 | $180,000 | $248,098 |
| 1990 | -- | 193,508 |
| 1991 | -- | 1,764,049 |
| 1992 | -- | 907,443 |
| 1993 | 3,600,000 | 220,000 |
| 1994 | 160,063 | 160,063 |
| 1995 | -- | 368,874 |
| Total | 3,940,063 | 3,862,035 |

We will not repeat the previously stated facts regarding the other improper deductions. Suffice it to say that we find that they represent a pattern demonstrating a consistent and deliberate attempt to understate petitioner's correct tax liabilities.

Consistent and substantial understatements of income over several years are highly persuasive evidence of intent to defraud the Government, particularly when combined with other indicia of fraud. See Baisden v. Commissioner, T.C. Memo. 2008-215. To this effect the Court of Appeals for the Ninth Circuit has stated: "repeated understatements in successive years when coupled with other circumstances showing an intent to conceal or misstate taxable income present a basis on which the Tax Court may properly infer fraud." Furnish v. Commissioner, 262 F.2d 727, 728-729 (9th Cir. 1958), affg. in part and remanding in part Funk v. Commissioner, 29 T.C. 279 (1957). Accordingly, we find petitioner's consistent understatements of income to be clear and convincing evidence of an intent to evade tax known to be owing.

2. Inadequate Records/Failure To Provide the Tax Return Preparers With Accurate Information

Petitioner's records consisted of sales, invoice, and check registers. However, petitioner did not provide these registers to the return preparers for their use in the preparation of petitioner's tax returns. Rather, Burton instructed Mr. Bradac and Ms. Toibin to use the summary/data sheets he had prepared.

The total sales amounts Burton provided for 1988 through 1993 do not match the sales amounts recorded in petitioner's sales registers.

At the time petitioner's 1988 through 1995 tax returns were prepared, Mr. Bradac was unaware of the existence of the Franklin Funds "R & D Division, ERG Inc." account and that the alleged research and development expenditures had been deposited into that account. Burton intentionally misled the tax return preparer by insisting that petitioner's payments to Aker qualified as research and development expenditures even though Mr. Bradac had told him the requirements for research and development deductions and credits.

Burton told the return preparer that the so-called royalty payments to NPI were made pursuant to a legal obligation when in fact the purported licensing agreement was nothing but a sham whose purpose was to reduce petitioner's taxable income. Burton also told Mr. Bradac that petitioner's insurance expenses did not include life insurance when Mr. Bradac asked whether the insurance expense included any life insurance. He also insisted that Mr. Bradac "LEAVE AS IS" the automobile expenses on petitioner's 1990 and 1993 tax returns after Mr. Bradac had inquired as to the substance of the expenses.

Burton's failure to keep and provide adequate records and his obfuscatory behavior--when questioned by Mr. Bradac regarding

claimed expenses--is evidence of petitioner's intent to evade taxes known to be owing by concealing corporate information and records and failing to provide this information to its tax return preparer. See Federbush v. Commissioner, 34 T.C. at 749-750.

3. Failure To File Tax Returns

Petitioner filed untimely tax returns for 1988, 1989, 1990, 1991, and 1992 indicating a disregard of its legal obligation to pay tax.

4. Implausible or Inconsistent Explanations of Behavior

a. Royalty and Engineering Services Invoices

At the meeting with the Internal Revenue Service (IRS) on May 8, 1996, Burton provided Revenue Agent Martin with recently fabricated royalty and engineering services invoices to support hundreds of thousands of dollars in alleged deductible expenses. The invoices were written on NPI letterhead and were respectively dated at the end of each calendar month in 1993. Burton had actually created and backdated the invoices shortly before the May 8, 1996, meeting but did not inform either Mr. Bradac or Revenue Agent Martin that these invoices had just been created. Burton's conduct was deceptive with the specific purpose of misleading respondent with respect to the legitimacy of the alleged royalty and engineering services expenses.

b. Research and Development Invoices

At the May 8, 1996, meeting Burton also provided Revenue Agent Martin with research and development invoices. The research and development invoices were written on Aker's letterhead and were provided to Revenue Agent Martin as support for the research and development deductions claimed on petitioner's 1993 tax return. Neither Aker nor Glendon had performed any research and development for petitioner. Burton had created and backdated the research and development invoices shortly before the May 8, 1996, meeting. Again, Burton did not disclose to Revenue Agent Martin that he had fabricated the research and development invoices shortly before the meeting. This was a deliberate attempt to mislead respondent.

5. Concealing Assets

During the examination of petitioner's tax returns respondent's agents issued several IDRs, requesting that petitioner provide records of all of its bank accounts. Although petitioner provided information regarding accounts at Bank of America and Merrill Lynch, no information was disclosed regarding the Franklin Funds "R & D Division, ERG Inc." account. When Revenue Agent Martin expanded the examination to include tax year 1994, she discovered that copies of several of the Bank of America canceled checks were missing. After inquiring further, Revenue Agent Martin determined that most of the missing checks

were payable to Aker and deposited into the Franklin Funds "R & D Division, ERG Inc." account.

In order to acquire information regarding the ownership of the Franklin Funds account, on February 6, 1997, respondent issued two summonses to Franklin Funds. When Burton learned of the summonses, he contacted Franklin Funds in an attempt to persuade it that the summonses did not pertain to petitioner's accounts. As a result, Franklin Funds indicated to the IRS that no records existed; but after issuing additional summonses to Franklin Funds, Revenue Agent Martin was able to determine that petitioner was the owner of the Franklin Funds "R & D Division, ERG Inc." account. Between 1988 and 1995 petitioner accumulated more than $700,000 in the Franklin Funds "R & D Division, ERG Inc." account.

6. Failure To Cooperate With Tax Authorities

Petitioner consistently failed to provide complete and accurate information to Revenue Agent Martin, and some of the information was false with the intent to mislead her.

7. Conclusion

Respondent has clearly and convincingly established that petitioner filed its 1988 through 1995 tax returns intending to conceal, mislead, or otherwise prevent the collection of tax. Accordingly, we hold that the requirements for the exception in section 6501(c)(1) to the 3-year period of limitations are met

and, therefore, each of the years at issue is open for assessment.

Before the trial in these cases petitioner moved for summary judgment on the fraud issue on the basis of our finding in <u>Benson v. Commissioner</u>, T.C. Memo. 2004-272 (Benson I), supplemented by T.C. Memo. 2006-55, affd. 560 F.3d 1133 (9th Cir. 2009). In Benson I we found that, even though there was evidence that could be considered indicia of fraud, respondent had failed to carry his burden of proving by clear and convincing evidence that Burton's individual returns were fraudulent with intent to evade tax. In the instant proceedings we denied petitioner's motion for summary judgment on the obvious grounds that petitioner and Burton are separate taxpayers and the issue of whether petitioner's tax returns were fraudulent was neither presented nor decided in Benson I. And while the parties agree that some of the fact findings in Benson I should be followed in the instant case, a separate trial was held in petitioner's case wherein additional evidence was presented to prove that petitioner's returns were fraudulent. We also note that some of the evidence of fraud regarding petitioner's returns was excluded from evidence in the Benson I trial pursuant to Burton's attorney's objection.[14]

---

[14]In <u>Benson v. Commissioner</u>, T.C. Memo. 2004-272 (Benson I), we expressed some concern about whether the return preparers
(continued...)

B.  Fraud Penalties

The determination of fraud for purposes of section 6501(c)(1) is the same as the determination of fraud for purposes of the fraud penalty under section 6663.  Neely v. Commissioner, 116 T.C. at 85; Rhone-Poulenc Surfactants & Specialties, L.P. v. Commissioner, 114 T.C. 533, 548 (2000).  Since we have already found that petitioner filed a fraudulent return under section 6501(c) for each of the years at issue, it follows that petitioner is also liable for the fraud penalty pursuant to section 6653(b) for tax year 1988 and section 6663 for tax years 1989 through 1995.

Common to both the old section 6653(b) and the newer section 6663 is the provision that when the Commissioner has established that any portion of the underpayment is due to fraud, the entire

---

[14](...continued)
might have shared responsibility for some of the inaccuracies regarding the improper reporting of transactions between petitioner and NPI, even though Burton was also responsible for misrepresenting the true nature of those transactions.  The records in the instant cases contain additional evidence, not presented in Benson I, regarding other similar inaccuracies and misrepresentations for which Burton is solely responsible.  For example, the improper deductions for research and development expenses that were allegedly paid to Aker, but were in fact deposited into petitioner's Franklin Funds account, were the result of misrepresentations that Burton made to the return preparers.  He falsely told them that research and development had been done and failed to disclose the existence of the Franklin Funds account.  And, as he did with respect to NPI invoices, Burton also fabricated invoices from Aker in another attempt to mislead respondent's agent regarding the validity of the research and development expenditures.

underpayment is treated as attributable to fraud except for any portion that the taxpayer establishes is not due to fraud.

Petitioner bears the burden of showing by a preponderance of the evidence what portion, if any, of the underpayment in each year is not attributable to fraud. See sec. 6663(b). Petitioner has failed to meet its burden.[15]

We hold that the entire underpayment for each of the years at issue is subject to the fraud penalty. Accordingly, we sustain respondent's determinations regarding the fraud penalty under section 6653(b) for 1988 and section 6663 for 1989 through 1995.

## C. $100,000 Retirement Plan Expense

On December 22, 1989, a $100,000 check was written on petitioner's Merrill Lynch Ready Asset Trust account made payable to "ERG-Retirement Trust". The memo section of the check shows "BBC [sic] Muir Terrace". In the notice of deficiency for tax year 1989, respondent allowed the $100,000 expense as a pension plan deduction, even though petitioner did not claim a deduction for it on its 1989 tax return.

---

[15]On brief petitioner has not asserted that any specific portion of the underpayment in each year was not attributable to fraud; rather, petitioner's argument was that no portion of any underpayment was attributable to fraud because Burton lacked "the specific intent" to evade income tax when he signed and filed petitioner's tax returns.

Respondent has not offered any convincing evidence to contradict the position originally taken in the notice of deficiency. Accordingly, we hold that petitioner is entitled to deduct $100,000 as a pension plan payment on its 1989 tax return under section 162.

D.  $94,401 Understatement of Gross Receipts

Respondent reconstructed petitioner's gross receipts using a bank deposits analysis. The parties agree to the bank deposits analysis, except for the inclusion of a $94,401 deposit into petitioner's Merrill Lynch account on March 27, 1992.

Muir Terrace was having financial problems which resulted in a lawsuit's being filed in Contra Costa Superior Court in 1989. In March 1992 a settlement was effected and a $94,401 check was paid to "Burton O. Benson, Tee, Research & Generation Ret. Trust." At trial Burton testified that the check was "a return on another investment that the ERG retirement trust had  * * * made in something that was termed BBC (sic) Muir Terrace, which was an investment of the ERG retirement trust." Burton also acknowledged that the $94,401 check was deposited into petitioner's general operating account rather than its retirement trust. Petitioner asserts that knowledge of the mistaken deposit was not discovered until pretrial preparation in spring 2008. Petitioner, however, has not shown by any probative evidence that the settlement funds were ever transferred into petitioner's

retirement trust. In fact, the only testimony Burton provided regarding whether the $94,401 had been transferred to petitioner's retirement trust was that he did not know whether it had been transferred.

On brief respondent asserts that he believes the appropriate adjustments are to allow the previously mentioned $100,000 deduction in 1989 and include the $94,401 in income in 1992. We agree with respondent. Accordingly, we hold that petitioner must include in its 1992 income the $94,401 it received and deposited into its general operating bank account.

E.   Section 6651 Additions to Tax

Respondent determined that petitioner was liable for an addition to tax under section 6651(a)(1) for tax years 1989 through 1992.

Section 6651(a)(1) provides for an addition to tax when a taxpayer fails to file a timely return. Section 6651(a)(1) provides an exception to the addition to tax when the failure to file a timely return "is due to reasonable cause and not due to willful neglect".

The parties agree that petitioner's 1989, 1990, 1991, and 1992 tax returns were received by respondent on August 28, 1994, November 20, 1994, July 16, 1995, and July 16, 1995, respectively. On brief petitioner has not contested the addition to tax under section 6651(a)(1) for any of the tax years 1989

through 1992. Consequently, we treat petitioner's failure to argue or address this issue on brief as a concession by petitioner. See Rule 151(e)(4) and (5); <u>Petzoldt v. Commissioner</u>, 92 T.C. at 683. Accordingly, we sustain respondent's determinations regarding the addition to tax under section 6651(a)(1) for tax years 1989 through 1992.

We have considered all of petitioner's contentions, arguments, requests, and statements. To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant. To reflect the foregoing, and because of the numerous concessions by the parties,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.