# United States Tax Court

T.C. Memo. 2023-44

ROBERT A. DI GIORGIO, SR.,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

ROBERT A. DI GIORGIO, SR. AND ZANDRA M. DI GIORGIO,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 15675-12, 15751-12.          Filed March 29, 2023.

————

Robert A. Di Giorgio, Sr., and Zandra M. Di Giorgio, pro sese.

*Derek P. Richman*, *Angela J. Ganase*, and *Daniel C. Munce*, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

BUCH, *Judge*: Robert Anthony Di Giorgio, Sr., was a mortgage lender and real estate salesman who specialized in distressed properties. He failed to report substantial income from those and other activities for 2005 through 2007 (years in issue). With his unreported income, Mr. Di Giorgio led a lavish lifestyle with extravagant vacations, including one to the Philippines where he met his second wife. During their marriage, he kept her in the dark about their true financial situation. Through a bank deposits analysis, the Commissioner determined income tax deficiencies, additions to tax, and civil fraud

[*2] penalties. The Di Giorgios challenged the Commissioner's determinations, and Ms. Di Giorgio asserted that she is entitled to innocent spouse relief under section 6015.[1] The Commissioner established by clear and convincing evidence that Mr. Di Giorgio underreported his income, that he underpaid his tax, and that those underpayments were due to fraud. Ms. Di Giorgio established that she is entitled to relief from joint and several liability.

FINDINGS OF FACT

Mr. Di Giorgio and his first wife incorporated Radius Capital Corp. (Radius CA) in California in 1995.[2] They held all outstanding shares as community property under California law. Radius CA operated as a mortgage lender and issuer of mortgage-backed securities, and Mr. Di Giorgio was its president and chief executive officer throughout its existence. Radius CA did business under other names, including Home Mortgage of America and Home Realty of America. Radius CA elected to be treated as an S corporation for income tax purposes.

Mr. Di Giorgio, his first wife, and their two sons moved to Cape Coral, Florida, in 2003. They purchased a home in which they resided. Mr. Di Giorgio's first wife passed away in December 2005. After her death, Mr. Di Giorgio continued working in Florida and remarried. We discuss his relationship with his second wife separately, below.

I.     *Business and Other Income-Producing Activities*

It is difficult to paint a precise picture of Mr. Di Giorgio's business activities. He held multiple bank accounts in his own name or in the names of his businesses. He did business with more than 30 title companies and myriad borrowers from whom he received and deposited payments in both his business and personal accounts. He comingled funds, moving money between those accounts and using business accounts for personal expenses. He provided the Court little in the way

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C.), in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

[2] Mr. Di Giorgio's first wife died in December 2005 and is not a party to these cases; Mr. Di Giorgio remarried in 2006. To reduce confusion, we refer to his first wife only as his "first wife" and to his second wife as his "second wife" or "Ms. Di Giorgio."

[*3] of books and records. Nevertheless, this is clear: Mr. Di Giorgio had many sources of income. His major income sources include (1) real estate sales, (2) Radius CA, (3) a similarly named entity, Radius Capital Corp. of Florida (Radius FL), (4) a Scottrade brokerage account, and (5) other miscellaneous sources.

A.   *Real Estate Sales*

Mr. Di Giorgio earned income from selling real estate in 2005 and 2006. He sold 12 properties in 2005 and 7 properties in 2006. He generally purchased "tax sale" homes that he would re-sell at higher prices without much refurbishment. He was the sole owner of each property he sold except one, which he co-owned with his first wife at the time of her death.

B.   *Radius CA*

Mr. Di Giorgio earned income from operating Radius CA in 2005 and 2006. He wrote checks from Radius CA to himself and used Radius CA's credit cards and bank accounts to pay personal expenses.

Radius CA earned income by making mortgage loans and selling mortgage-backed securities. A mortgage-backed security is created when a lender pools a group of mortgage loans and sells interests in the pool to investors. During 2005 and 2006, Radius CA sold at least 15 mortgage-backed securities.

In connection with those securities, the Securities and Exchange Commission (SEC) filed a complaint against Radius CA and Mr. Di Giorgio alleging that they defrauded the Government National Mortgage Association (Ginnie Mae). The SEC prevailed in 2015. Mr. Di Giorgio and Radius CA were enjoined from selling mortgage-backed securities and were held jointly and severally liable for disgorgement of $1,427,095, which represented profits obtained from the violations. *See SEC v. Radius Cap. Corp.*, No. 2:11-cv-116-FtM-29DNF, 2015 WL 1781567, at *11 (M.D. Fla. Apr. 20, 2015). The U.S. Court of Appeals for the Eleventh Circuit affirmed. *See SEC v. Radius Cap. Corp.*, 653 F. App'x 744 (11th Cir. 2016).

According to Mr. Di Giorgio, Radius CA no longer operated as of 2007. But Radius CA was not completely inactive. That year, he nominally made his second wife Radius CA's president, using her maiden name on the paperwork. In April 2007, Radius CA transferred ownership of real property at 215 Flamingo Street, Fort Myers Beach,

[*4] Florida, to Mr. Di Giorgio by corporate warranty deed. His second wife's maiden name was used on the corporate warranty deed for Radius CA, but it was not her signature. At trial, she did not recognize the document or the signature. She was unaware of what a corporate warranty deed was and was unsure of whether Radius CA or Mr. Di Giorgio owned the Flamingo Street property. Mr. Di Giorgio deposited the proceeds of the sale in a personal bank account that he did not share with his second wife.

### C.   *Radius FL*

Mr. Di Giorgio earned income from Radius FL, which was distinct from Radius CA, in 2005 through 2007. His nephews were involved in Radius FL, but its operations, ownership, and relationship to Radius CA are unclear from the record. Automatic Data Processing, Inc. (ADP), periodically issued checks to Mr. Di Giorgio from Radius FL in 2005 and 2006. And throughout the years in issue, he frequently withdrew cash and wrote checks to himself from Radius FL's bank account, and he deposited those checks in his personal accounts. Memos written on the checks included, among others, "income dispersement" (sic), "return on investment," "multiple commissions," and "multiple accounts." Radius FL used Mr. Di Giorgio's mortgage license in its operations because it did not otherwise have one.

### D.   *Scottrade Brokerage Account*

In 2007, Mr. Di Giorgio earned income from trading securities through a Scottrade brokerage account. He transferred at least $805,000 to the account that year. He received dividends totaling $29,791.

### E.   *Miscellaneous*

Mr. Di Giorgio had other sources of both nontaxable and taxable income including a life insurance policy, retirement accounts, and a company called Quickbling Investment Corp., Inc. (Quickbling).

In March 2006, Mr. Di Giorgio received $1,008,039 representing proceeds from an insurance policy on the life of his first wife. He deposited those proceeds in a personal account.

In February 2007, he incorporated Quickbling. In May 2007, he made his second wife nominal vice president, but she did not work for Quickbling and did not know its business purpose. It is unclear from the

[*5] record what Quickbling did, and its one bank account included in the stipulation had little activity.

Mr. Di Giorgio received retirement account distributions totaling $88,781 during 2007. He was in his midforties that year.

II.   *Lifestyle*

Mr. Di Giorgio's income funded his lifestyle. He owned a four-bedroom waterside home. He also owned a beach house at which his sons from his first marriage resided at times. He owned multiple cars, boats, and jet skis, and he spent large sums at marinas. In 2007, he traded his boat toward the purchase of a $300,000 yacht. He traveled regularly, stayed in expensive hotels, and purchased airfare and other items for family members.

III.   *Reporting*

On federal income tax returns that he prepared, Mr. Di Giorgio painted a picture that differed from the lifestyle he led. For each year in issue, Mr. Di Giorgio filed a Form 1040, U.S. Individual Income Tax Return, on which he reported taxable income of zero. As president of Radius CA, he filed Form 1120S, U.S. Income Tax Return for an S Corporation, for 2005 but failed to do so for 2006 and 2007. He filed his returns late for each year in issue.

A.   *2005 Returns*

Mr. Di Giorgio filed his 2005 individual return with the status of married filing separately. He reported adjusted gross income (AGI) of $50,192, which consisted of $37,685 of wages, $105,029 of taxable interest, a $9,018 net profit from Schedule C, Profit or Loss From Business, a net loss of $85,673 from Schedule E, Supplemental Income and Loss, and self-employment deductions totaling $15,867. Radius FL issued a Form W–2, Wage and Tax Statement, for the wages Mr. Di Giorgio reported, but he did not attach the Form W–2 to his return. Instead, he attached Form 4852, Substitute for Form W–2, Wage and Tax Statement, or Form 1099–R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc., on which he listed himself as both the payor and the payee of the wages. The Schedule C profit stemmed from Radius CA, for which he reported gross receipts or sales of $62,951 and expenses totaling $53,933. He claimed itemized deductions and exemptions far greater than his AGI and reported taxable income of zero. The

[*6] Schedule E loss stemmed from rental real estate activities. On Schedule E, Part I, Income or Loss From Rental Real Estate and Royalties, Mr. Di Giorgio reported six rental real estate properties, rents of $1,920, and expenses totaling $87,593. Mr. Di Giorgio did not include Schedule E, Part II, Income or Loss From Partnerships and S Corporations.

Mr. Di Giorgio also filed a 2005 Form 1120S for Radius CA. He reported net ordinary business income of $105,029, matching the amount reported on his personal Schedule B, Interest and Ordinary Dividends. That net amount consisted of $3,501,052 of gross receipts and deductions totaling $3,396,023. Among others, the deductions included $489,606 for salaries and wages, $1,890,013 for commissions, and $37,685 for officer compensation—the same amount that Mr. Di Giorgio reported as his wages on his Form 1040. However, ADP records showed that Radius FL, not Radius CA, paid Mr. Di Giorgio those wages. Further, ADP records showed that Radius CA paid its employees considerably less wages than Mr. Di Giorgio reported as expenses; ADP sent him payroll records showing wages of $247,927.

B.    *2006 Returns*

Mr. Di Giorgio filed two Forms 1040 for 2006. He filed an original return electing qualifying widower status. He later filed an amended joint return with his second wife, which the Internal Revenue Service (IRS) accepted, but the parties agree that his correct status is surviving spouse.

The Di Giorgios reported negative AGI of $388,259, which consisted of $22,201 of wages, $27,929 of taxable interest, a $4,551 loss deduction from Schedule C, a $3,000 capital loss deduction from Schedule D, Capital Gains and Losses, a $437,391 loss deduction from Schedule E, $6,603 of unemployment compensation, and a $50 tuition and fees deduction. They claimed itemized deductions, seven personal exemptions, and an additional child tax credit. They reported taxable income of zero and claimed a refund of $1,013.

The Schedule C loss stemmed from Radius CA. They reported gross income of $49,330 and expenses totaling $53,881. Those expenses included car and truck expenses for two vehicles. They reported 48,066 business miles (roughly 132 miles per day).

The Schedule E reflected a loss deduction from a combination of rental real estate activities and Radius CA. On Schedule E, Part I, they

[*7] reported five rental properties, including Flamingo Street, which Radius CA owned and Mr. Di Giorgio's sons used as a residence. They reported a $45,567 net loss, which consisted of rents of $880 and expenses totaling $46,447. On Part II, they reported a $391,824 loss from Radius CA. They provided an employer identification number but did not file Form 1120S for Radius CA, so they failed to report how they calculated that amount.

### C.    *2007 Return*

Mr. Di Giorgio and his second wife filed a joint return for 2007. They reported negative AGI of $5,310, which consisted of $3,300 of wages, $24,013 of taxable interest, a $3,000 loss deduction from Schedule D, a $32,689 loss deduction from Schedule E, $3,600 of state unemployment compensation, and a $534 tuition and fees deduction. They omitted Mr. Di Giorgio's dividend income and retirement account distributions. They claimed six exemptions and various itemized deductions. They reported taxable income of zero.

The Schedule D loss stemmed from a short-term capital loss on the sale of "CRNT" stock. The Schedule E loss reportedly stemmed from rental real estate activities. On Schedule E, Part I, they reported one rental property, Flamingo Street (which Radius CA had transferred to Mr. Di Giorgio that year). They reported rents of $4,250 and expenses totaling $36,939.

## IV.   *IRS Examination*

The IRS examined the 2005 through 2007 returns. The examination began in or around 2008 and ended in 2011. The revenue agent who conducted the examination considered Mr. Di Giorgio to have been uncooperative and adversarial. There is no evidence that his second wife was involved in the examination.

Mr. Di Giorgio failed to communicate with the revenue agent and missed multiple scheduled meetings without notice. He changed his phone numbers without informing the revenue agent, so she had to contact him by mail, delaying the audit.

Mr. Di Giorgio failed to respond to document requests. The revenue agent requested bank and business records several times. Mr. Di Giorgio did not provide any bank records, although he did provide the revenue agent with information about one account so she could find and obtain the records herself. He informed the revenue agent that the SEC

**[*8]** took all of his business records and that he did not have copies. He provided no information to help the revenue agent obtain his records from the SEC, and there is no evidence that he ever attempted to reclaim his own records.

The revenue agent obtained documents from third parties and issued summonses to banks and title companies. She uncovered multiple bank accounts, real estate sales, and mortgages that Mr. Di Giorgio had failed to disclose. Whereas he told her about one bank account and a few sales, she discovered more than ten of each.

During the audit, Mr. Di Giorgio gave the IRS four documents that the revenue agent considered suspect or false. The documents consisted of three invoices, each allegedly issued by a different person, and one statement from an alleged real estate partner. All four documents pertain to 3420 SE 4th Place, Cape Coral, Florida, a property Mr. Di Giorgio purchased on August 1, 2005, and sold on December 7, 2005.

The revenue agent noticed that the invoices contained consistent but unusual typographical errors. On all three, the issuer's address included a lowercase street designation (i.e., "ct", "rd", "lane"). She noticed the same idiosyncrasy in multiple places on Mr. Di Giorgio's 2006 and 2007 returns. Two of the invoices lacked a ZIP Code for the sender. When the revenue agent tried looking up the addresses to find the ZIP Codes, she discovered the addresses were invalid. She attempted, but was unable, to contact any of the invoice issuers. Various other oddities indicated that the invoices were fabricated, such as bracketed invoice numbers or the statement "Make all checks payable to [Your Company Name]." One is dated more than a year after Mr. Di Giorgio sold the property. And although Mr. Di Giorgio sold the property as "vacant land," the invoices were for improvements such as drywall or stucco.

The revenue agent also found a signed statement provided by Mr. Di Giorgio to be suspect. The statement was allegedly from a business partner, Ms. Russell (Russell statement), and read: "This is to confirm that [Ms.] Russell was a 50% owner of the property located at 3420 4th Place Cape Coral, Florida. 33904." Although it was signed in Ms. Russell's name, it did not include any contact information and gave no indication of the timeframe to which it applied. The revenue agent found a canceled check written from Ms. Russell's bank account amongst the

**[*9]** summoned bank records and compared it to the Russell statement. The signatures were markedly different.

V.  *Bank Deposits Analysis*

The revenue agent conducted a bank deposits analysis using summoned records. The revenue agent calculated total deposits, then considered nontaxable sources, transfers, previously reported income, and deductible expenses. The revenue agent discovered unreported income, which she categorized or attributed to various sources depending on where it was deposited. She attributed personal account deposits to a general category of unreported income (much of which came from Radius FL, which was not included in the audit). Other categories included gain from real estate sales, dividends, and retirement account distributions. She attributed deposits in Radius CA's accounts to S corporation gross receipts.

Overall, despite determining that a significant portion of the deposits was nontaxable, already reported, or included in other adjustments, the Commissioner determined a large amount of unreported income. The Commissioner categorized the unreported income and unreported deposits as stemming from either Radius CA or other sources. He determined taxable deposits from Radius CA of $1,158,273 and $5,267,876 for 2005 and 2006, respectively. And he determined other taxable deposits of $2,404,793, $1,374,340, and $1,409,068 for 2005, 2006, and 2007, respectively.

VI.  *Civil Fraud Penalty*

The revenue agent decided to assert fraud and accuracy-related penalties. On June 15, 2011, the IRS mailed a Letter 915 (also known as a 30-day letter) to the Di Giorgios for each year in issue. The IRS included an examination report that asserted a fraud penalty for each year with each 30-day letter. The revenue agent's acting group manager signed the 30-day letters before mailing.

VII.  *Notices of Deficiency*

The Commissioner mailed two notices of deficiency on March 22, 2012, one to Mr. Di Giorgio for 2005, and the other to Mr. Di Giorgio and his second wife for 2006 and 2007. In the notices, the Commissioner determined taxable income of $6,688,864, $6,583,636, and $1,624,946 for 2005, 2006, and 2007, respectively. The Commissioner determined the following deficiencies, additions to tax, and penalties:

| [*10] Year | Deficiency | Additions to Tax/Penalties | |
| --- | --- | --- | --- |
| | | § 6651(a)(1) | § 6663 |
| 2005 | $2,344,453 | $586,113 | $1,758,340 |
| 2006 | 2,294,704 | 573,423 | 1,720,313 |
| 2007 | 549,815 | 54,982 | 412,361 |

The deficiencies largely result from the unreported deposits in the amounts discussed above. The parties agree that the other unreported income amounts include unreported interest of $3,284, $15,030, and $1,768 for 2005, 2006, and 2007, respectively. The Commissioner also made various other income adjustments, reduced or disallowed some deductions, and allowed several previously unclaimed deductions. The Commissioner disallowed dependency exemptions for 2006. Finally, the Commissioner made various computational adjustments.

### A. Real Estate Sales (Schedule C)

The Commissioner determined Schedule C receipts from the sale of property and allowed previously unreported income offsets to calculate net gain. For 2005, the Commissioner determined a $419,000 net gain. For 2006, the Commissioner determined a $318,469 net gain.

The Commissioner disallowed deductions for reported Schedule C expenses. For 2005, the Commissioner disallowed deductions for vehicle and depreciation expenses and allowed $4,309 for various other expenses (while disallowing $13,374). For 2006, the Commissioner disallowed deductions for vehicle expenses and allowed $176 for various other expenses (while disallowing $31,101). The Commissioner also allowed an unclaimed mortgage interest expense of $51,537.

### B. Rental Real Estate (Schedule E)

The Commissioner disallowed deductions for all rental real estate losses reported on Schedules E for 2005 through 2007. The Commissioner determined the rental activities were passive and that all the expenses that generated the losses lacked substantiation. For 2007, the Commissioner further determined that the rental activity was for a vacation home for personal use.

**[*11]**   C.   *Radius CA (Schedule E)*

The Commissioner allocated all of Radius CA's income to Mr. Di Giorgio on the basis of his 100% ownership of Radius CA. For 2005, the Commissioner determined a distributive share of $3,859,301. In reaching that amount, the Commissioner allowed deductions totaling $694,995. For 2006, the Commissioner determined a distributive share of $4,905,005. In reaching that amount, the Commissioner allowed unclaimed deductions for expenses (including salaries and wages, commissions, advertising, interest, and "other" expenses) totaling $362,871.

D.   *Dividends*

The Commissioner determined dividends of $29,791 for 2007.

E.   *Capital Gain/Loss*

For 2006 and 2007, the Commissioner disallowed claimed capital loss deductions of $3,000 for both years. Mr. Di Giorgio agrees to the disallowance for 2006, and the Commissioner concedes the 2007 adjustment.

F.   *Retirement Account Distributions*

The Commissioner determined distributions of $88,780 for 2007 and imposed additional tax pursuant to section 72(t).

G.   *Unemployment Compensation*

The Commissioner determined unemployment compensation of $5,225, rather than the $3,600 Mr. Di Giorgio reported. Mr. Di Giorgio agrees with the Commissioner's determination.

H.   *Itemized Deductions*

Because of a lack of substantiation, the Commissioner disallowed claimed itemized deductions for 2005 and 2006. For 2005, the Commissioner disallowed deductions for medical and dental expenses and real estate taxes. For 2006, the Commissioner disallowed deductions for personal property taxes and home mortgage interest.

[*12] VIII.  *Mr. Di Giorgio's Second Wife*

Mr. Di Giorgio met his second wife, Zandra Di Giorgio, online in December 2005. She lived in the Philippines, where she was born and raised. She was 26 years old and had two minor children from a prior relationship. She had a high school education and had taken some college nursing courses but never finished the program. Her work history was limited to roughly two weeks of employment at a Dunkin Donuts. English is not her first language.

Mr. Di Giorgio traveled to the Philippines in January 2006 and their online relationship became an in-person one. Ms. Di Giorgio was not accustomed to his lifestyle. He took her to expensive resorts, rented her an apartment, and bought her gifts. After several months of traveling to and from the Philippines, he proposed marriage, and she accepted. She and her children moved to Cape Coral in July 2006. They entered the United States on a "fiancée visa," which she understood required her to marry Mr. Di Giorgio within three months, and they married in September 2006. However, she and her children were considered nonresident aliens for 2006, and Mr. Di Giorgio had not adopted her children as of the end of that year. *See* I.R.C. § 7701(b).

Compared to their long-distance relationship, their relationship in Cape Coral was different. If Ms. Di Giorgio did something wrong or was forgetful, Mr. Di Giorgio would "yell and scream [at the] top of his lungs." He disparaged her, for example, by telling her that she was "so lucky that he took [her] out of that jungle." Ms. Di Giorgio's testimony about this statement was credible and consistent with Mr. Di Giorgio's statements at trial; for example, he stated that "the dog always wags its tail for the master and knows where it's been fed" in reference to Ms. Di Giorgio. She feared that if she didn't do what he wanted, she would jeopardize their relationship and her status in the United States.

Mr. Di Giorgio controlled family finances. Ms. Di Giorgio had no experience with accounting, finance, mortgages, mortgage-backed securities, real estate, or U.S. taxes. Mr. Di Giorgio discouraged her from working outside the home, and she did not meaningfully participate in his businesses. All she knew about his business was that he sold houses. She was not a joint accountholder on any of the bank accounts that the Commissioner included in his bank deposits analysis. Mr. Di Giorgio gave her spending money in cash or by transferring it to her separate account, but she was not primarily responsible for paying bills or

[*13] handling household expenses. She did not, for example, pay the mortgage on their home during the years in issue.

Ms. Di Giorgio had never seen a U.S. tax return before 2008. That year, she signed a joint return for 2007 that she played no role in preparing. Mr. Di Giorgio gave her the signature page and told her to sign it without showing her the other pages. She asked what she was signing, but Mr. Di Giorgio told her she wouldn't understand and instructed her to just sign. She was afraid of disobeying him, so she signed the return.

Ms. Di Giorgio was unaware of her husband's legal and financial problems when she signed the return, but they eventually came to light. At the beginning of their relationship, she trusted him and saw him as a financially successful person on the basis of their vacations in the Philippines and the new lifestyle that greeted her in Florida. He was not open about his issues with Ginnie Mae and the IRS; and although they traveled less after she moved to Cape Coral, they still went on two Caribbean vacations in 2007. However, after the years in issue, they purchased a marital home and lost it in foreclosure. And when Ms. Di Giorgio was pregnant with their second child in 2011, the SEC sued Mr. Di Giorgio. She then came to understand that he named her as president of Radius CA and vice president of Quickbling to avoid government scrutiny. She was surprised by these revelations.

IX.    *Petitions and Request for Innocent Spouse Relief*

On June 19, 2012, while residing in Florida, the Di Giorgios timely petitioned for redetermination of their federal income tax liabilities. In February 2014, Ms. Di Giorgio filed an Amendment to Petition wherein she raised innocent spouse relief under section 6015 for 2006 and 2007, and she filed an administrative request for relief with the Commissioner while these cases have been pending. The parties agree that the Di Giorgios were ineligible for joint filing status for 2006, and as a result, innocent spouse relief is no longer an issue for that year. The Commissioner concedes that she is entitled to relief for 2007.

By the time of the trial in December 2021, the Di Giorgios' relationship had deteriorated. They separated and had been living apart since 2019. At trial, they were in the midst of a years-long divorce proceeding.

Ms. Di Giorgio's financial situation had also changed significantly since the years in issue. During 2021, Ms. Di Giorgio had two

[*14] dependents and worked as an in-home caregiver earning $15 per hour. She reported monthly income of $3,100 and living expenses of $4,750. In December 2021, she was temporarily out of work because her client had recently passed away. She reported having tangible assets (including jewelry, furniture, and clothing) with an estimated value of $22,500, but only $216 in cash. She reported liabilities of $201,419, including first and second mortgages, credit card debt, and student loans.

OPINION

These consolidated cases involve two taxpayers, two dockets, and three years. Docket No. 15675-12 involves the redetermination of a deficiency for 2005 as to Mr. Di Giorgio. Docket No. 15751-12 involves the redetermination of deficiencies for 2006 and 2007 as to Mr. Di Giorgio and Ms. Di Giorgio. Each year involves a tax deficiency, an addition to tax for late filing under section 6651(a)(1), and a section 6663 civil fraud penalty (or a section 6662 accuracy-related penalty in the alternative). Ms. Di Giorgio raised innocent spouse relief under section 6015 for 2006 and 2007, the years for which she is a party; however, the parties have already agreed that she has no liability for 2006.

I.    *Mr. Di Giorgio's Credibility*

Before turning to our discussion, we must address Mr. Di Giorgio's credibility at trial. Mr. Di Giorgio's testimony was not credible. He tried to downplay his financial success. He testified that vacationing in the Philippines was inexpensive because of exchange rates. This explanation was inconsistent with Ms. Di Giorgio's testimony and his American Express statements, which show that he spent thousands in U.S. dollars at luxury hotels. In 2006, he spent nearly $40,000 at the Ritz Carlton in Florida. He testified that he chose to live in Cape Coral because it was a cheap place to own a waterside home, but he reported on a credit application that his home was valued at more than $1 million. On the same credit application, he reported that his gross monthly income was $33,000, which annualizes to $396,000.

Mr. Di Giorgio's testimony about his records also lacked credibility. He told the revenue agent that the SEC had seized them, but he testified that "without notice, Ginnie Mae came out and they seized everything at Radius [CA]" in early 2006. He testified that he never saw the records again but then testified that he "saw copies of those records" that "the SEC wanted to give [him]." He also testified that while he

**[\*15]** "produced a lot of records" to substantiate his expenses, the Commissioner allegedly lost them. His testimony is inconsistent with the revenue agent's testimony and with the documentary record. The revenue agent returned his documents at the end of the audit and gave him the summoned records at no cost.

Mr. Di Giorgio's testimony about the Russell statement also lacked credibility. After the revenue agent testified about the Russell statement and the check she found from Ms. Russell's bank account, Mr. Di Giorgio testified that he was the one who gave the revenue agent the check because it "was the only thing [he could] find" to show that Ms. Russell was his partner in selling real estate. He further testified that, because the "check . . . wasn't good enough" for the revenue agent, he solicited the Russell statement:

> [W]hat I'm *not speculating* on is that I had asked [Ms.] Russell to give me that documentation to prove . . . that she was a partner. . . . At my request, Ms. Russell wrote me a letter testifying to the facts about her ownership. . . . The only reason to add the secondary document was because the first document wasn't clear enough for [the revenue agent].

(Emphasis added.) After the IRS introduced the Russell statement at trial, Mr. Di Giorgio changed his story. He testified that he could not recall soliciting the statement or giving it to the Commissioner. He further testified that during his earlier testimony, he "was *speculating*" about what he would have done on the basis of the revenue agent's testimony that she questioned the check he "gave" her. (Emphasis added.) The revenue agent found the check (he did not give it to her), and she drew no connection between it and the Russell statement other than to compare the signatures.

His testimony contradicted other witnesses' testimony. For example, he testified that his Schedule C vehicle expenses for 2006 included mileage for three people—himself, his second wife, and an employee. He also testified that Ms. Di Giorgio participated in the business during the years in issue. However, Ms. Di Giorgio testified that she could not drive in 2006 and did not participate in the business during the years in issue. He also testified that he held joint accounts with Ms. Di Giorgio, which was inconsistent with her testimony and the actual bank records. In sum, he was not credible

**[\*16]** II. *Deficiency (Unreported Income and Disallowed Deductions)*

 A. *Burden of Proof*

Generally, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving error. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Taxpayers bear the burden of proving that they are entitled to claimed deductions and credits. Rule 142(a); *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). Carrying that burden requires the taxpayer to "substantiate the nature, amount, and purpose of a claimed deduction." *Sezonov v. Commissioner*, T.C. Memo. 2022-40, at \*4. In limited situations, the burden may shift to the Commissioner under section 7491(a). The record does not support shifting the burden to the Commissioner.

The Commissioner reconstructed Mr. Di Giorgio's income using the bank deposits method. Taxpayers must maintain books and records sufficient to establish their income and expenses, and if they fail to do so, the Commissioner may reconstruct income through any reasonable method. I.R.C. §§ 6001, 446(b); *Petzoldt v. Commissioner*, 92 T.C. 661, 693 (1989); Treas. Reg. § 1.6001-1(a). We have long accepted the bank deposits method for this purpose. *DiLeo v. Commissioner*, 96 T.C. 858, 881 (1991), *aff'd*, 959 F.2d 16 (2d Cir. 1992); *Clark v. Commissioner*, T.C. Memo. 2021-114, at \*34. The bank deposits method assumes that all money deposited into a taxpayer's account is taxable income unless the taxpayer can show that the deposits are not taxable or were previously reported. *DiLeo*, 96 T.C. at 868; *Brodsky v. Commissioner*, T.C. Memo. 2001-240, 82 T.C.M. (CCH) 505, 530. However, the Commissioner must account for any nontaxable source or deductible expense of which he has knowledge. *DiLeo*, 96 T.C. at 868; *Brodsky*, 82 T.C.M. (CCH) at 530.

Here, the Commissioner calculated deposits, determined that some were nontaxable or already included in income, and allowed deductions. To support the analysis, the Commissioner produced bank records, canceled checks, and withdrawal and deposit slips cross-referencing Mr. Di Giorgio's bank accounts. Further, the Commissioner proved likely sources of the income, including Radius CA, Radius FL, real estate sales, and stock trading, among others. The Commissioner's analysis is well supported, and we accept the reconstruction of income and expenses as reasonable and accurate.

[*17] B.    *Mr. Di Giorgio's Arguments*

Mr. Di Giorgio argues that the Commissioner's reconstruction is excessive for various reasons.

1.    *Nontaxable Sources*

The Commissioner accounted for nontaxable deposits, but Mr. Di Giorgio argues additional amounts are nontaxable. He argues that nontaxable sources include double-counted life insurance proceeds, loan principal, transfers, and deposits taxable to third parties. He cites no documentary evidence in the record to support his argument. He received $1,008,039 of life insurance proceeds in 2006, but that amount is less than the amount the Commissioner has already determined to be nontaxable for that year. Because Mr. Di Giorgio did not establish any nontaxable sources in excess of what the Commissioner already allowed, he did not meet his burden. *See Hradesky v. Commissioner*, 65 T.C. 87, 89–90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976).

2.    *Real Estate Sales (Schedule C)*

Mr. Di Giorgio argues that the Commissioner's determinations of income from real estate sales for 2005 and 2006 are excessive. In the notices of deficiency, the Commissioner determined net gain from both reported and unreported sales. Through subsequent stipulations, the Commissioner agreed to reduce the amounts of gain to $373,836 and $252,853 for 2005 and 2006, respectively. Mr. Di Giorgio argues that these reduced amounts are not low enough.

First, Mr. Di Giorgio asserts that he had real estate partners to whom some of the gain must be allocated. He generally testified that his nephews and Ms. Russell were his partners, but he cites only one document in the record to support his assertion. Specifically, he claims that a check "payable to [Ms.] Russell . . . clearly show[s]" that she was his partner. Setting aside the fact that the check was payable to Mr. Di Giorgio (from Ms. Russell), it does not establish a partnership. Other than Mr. Di Giorgio's testimony, which was not credible, there is no evidence he had any partners in selling real estate. He did not meet his burden.

Mr. Di Giorgio further asserts that he incurred deductible business expenses. In the notices of deficiency, the Commissioner disallowed vehicle, depreciation, and various other expenses for 2005,

[*18] and vehicle and various other expenses for 2006 (all of which are in dispute).

In his brief, Mr. Di Giorgio argues that he may deduct vehicle expenses and depreciation. He generally testified that he had vehicle expenses during 2005 and 2006 but cites no documentary evidence of those expenses in the record. Vehicle expenses require strict substantiation, and his testimony was insufficient to meet this standard. *See* I.R.C. §§ 274(d), 280F(d)(4); *Shah v. Commissioner*, T.C. Memo. 2015-31, at *18–19. Otherwise, he offered no documentary evidence as to the remaining expenses. We uphold the Commissioner's determination.

### 3. *Rental Real Estate Activities (Schedule E)*

Mr. Di Giorgio argues that he is entitled to losses from real estate activities. Each year, Mr. Di Giorgio reported expenses far greater than his rental income and deducted the losses against nonpassive income. The amounts at issue are $85,673, $45,567, and $32,689 for 2005, 2006, and 2007, respectively. Mr. Di Giorgio argues that he was "at all times . . . a license[d] real estate broker [who] personally managed his properties and [is] entitled to claim [nonpassive] losses."

Section 162(a) generally allows a deduction for ordinary and necessary trade or business expenses, while section 469(a)(1)(A) and (b) disallows a deduction for "passive activity loss." Section 469(c)(2) treats all rental activity as passive, but section 469(c)(7)(A)(i) carves out an exception for rental activities of taxpayers who are "real estate professionals." *See Sezonov*, T.C. Memo. 2022-40, at *4. To qualify as a real estate professional, the taxpayer generally must perform at least 750 hours of services in a real property trade or business in which he "materially participates," among other requirements. I.R.C. § 469(c)(7)(B); *Sezonov*, T.C. Memo. 2022-40, at *4–5.

We need not address the question of whether Mr. Di Giorgio's losses are passive if he failed to establish that his rental real estate activities generated a loss. To do so, Mr. Di Giorgio must establish that he incurred deductible expenses under section 162. Mr. Di Giorgio did not specifically testify about expenses he incurred in connection with his reported rental properties, and he cites no documentary evidence of the reported expenses. Further, he did not provide any evidence from which the Court could make a reasonable estimate of his expenses. *See Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir. 1930); *Mileham v.*

[*19] *Commissioner*, T.C. Memo. 2017-168, at *36. Thus, he has not shown that he incurred deductible expenses. Because he did not meet his burden regarding expenses, we need not reach the question of whether he was a real estate professional. We note, however, that Mr. Di Giorgio did not offer any evidence of the number of hours he served in a real property trade or business.

### 4. *Radius CA – Schedules E*

Mr. Di Giorgio disputes the Commissioner's determination of his distributive share of ordinary income from the S corporation Radius CA for 2005 and 2006. The parties agree that Mr. Di Giorgio owned a 50% interest in Radius CA for the first 341 days of 2005 and 100% for the remaining 24 days, after his first wife passed away. He was the sole owner in 2006.

S corporations are passthrough entities, which generally are not subject to income tax. I.R.C. § 1366(a); *see Tribune Media Co. v. Commissioner*, T.C. Memo. 2021-122, at *40–41. Rather, section 1366(a)(1) provides that an S corporation's income, losses, deductions, and credits are passed through to its shareholders. An S corporation shareholder must take the S corporation's income into account on his or her individual income tax return regardless of whether any income is distributed. *See Alt. Health Care Advocs. v. Commissioner*, 151 T.C. 225, 240 (2018). In determining income to Radius CA, the Commissioner took into account deposits to Radius CA's bank accounts and reduced them by any deposits from nontaxable sources. Mr. Di Giorgio did not establish any additional nontaxable sources or establish that he did not have an interest in Radius CA.

Mr. Di Giorgio also argues that the Commissioner failed to take into account Radius CA's expenses (e.g., payroll, commissions, and bad debts). For the first time on brief, he also argues that the SEC's judgment against him is an enforceable debt that is deductible for the year he incurred it. Mr. Di Giorgio's arguments are unsupported by the record.

First, the record shows that the Commissioner either allowed in the notices of deficiency or agreed to by stipulation various expenses, including salaries, wages, and commissions, among others. Mr. Di Giorgio failed to prove that Radius CA incurred deductible expenses beyond those amounts already allowed or agreed upon. *See Hradesky*, 65 T.C. at 89–90. His generalized testimony was not credible, and in his

**[*20]** brief, he refers to only one document evidencing a commission payment. Mr. Di Giorgio did not cite where that document might be located in the record, and the Court was unable to independently locate it.

Second, as for any payment he may have made to the SEC, there is no evidence in the record that Mr. Di Giorgio paid any outstanding judgment. *See* I.R.C. § 162(a), (f); *Ziroli v. Commissioner*, T.C. Memo. 2022-75, at *7–9. Indeed, the judgment did not arise until 2015, after the years in issue.

### 5. *Dividends*

Mr. Di Giorgio does not appear to dispute his receipt of dividend income, but he argues that he "should not be rule[d] to have received unreported dividends especially with regard to [CRNT stock]" for which he had a capital loss. His argument is without merit. The Commissioner produced Scottrade records showing payment of dividends, and Mr. Di Giorgio failed to establish any error in the Commissioner's determination.

### 6. *Retirement Account Distributions*

In his petition, Mr. Di Giorgio disputed the Commissioner's determination of distributions from retirement accounts. For 2007, the Commissioner determined taxable distributions of $88,780 and additional tax of $8,878 pursuant to section 72(t), which imposes a 10% tax on early distributions from qualified retirement plans that are includible in gross income. Mr. Di Giorgio alleged that some of the distributions were from his first wife's retirement plan and were a nontaxable inheritance. He did not mention the distributions at trial or in his brief. To the extent that he argued the determination was erroneous, we treat him as having abandoned that argument. *See* Rule 151(e)(4) and (5); *Petzoldt,* 92 T.C. at 683. Further, the record shows that the premature distributions came from Mr. Di Giorgio's retirement plan, not his first wife's.

The distributions are subject to the additional tax under section 72(t). Section 72(t)(2) provides certain exceptions from this additional tax, but Mr. Di Giorgio neither argued nor established that any exception applies.

**[*21]** C.     *Itemized Deductions*

Mr. Di Giorgio argues that he is "entitled to claimed itemized deductions" for 2005 through 2007. The Commissioner disallowed deductions for medical and dental expenses, real estate taxes, personal property taxes, and home mortgage interest. Mr. Di Giorgio put on no evidence of those expenses at trial. Because he bears the burden of proof on this issue, his failure precludes him from prevailing. *See Nitschke v. Commissioner*, T.C. Memo. 2016-78, at *4–5, *9; *Miller v. Commissioner*, T.C. Memo. 2014-105, at *11–13.

D.     *Dependency Exemptions*

Mr. Di Giorgio argues that he should be permitted to claim Ms. Di Giorgio's children as dependents for 2006 for purposes of section 151(c). The parties agree Mr. Di Giorgio's correct filing status was qualifying widower, that the children were nonresident aliens, and that he had not adopted them as of December 31, 2006. However, he argues that the children qualify as dependents because he supported them and they lived with him for more than six months during 2006.

Section 152(b)(3)(A) provides that a "dependent" does not include certain nonresident aliens. Section 152(b)(3)(B) provides an exception for nonresident alien children who have been adopted by the taxpayer. *See* I.R.C. § 152(f)(1)(B). As of the end of 2006, Ms. Di Giorgio's children were nonresident aliens, and Mr. Di Giorgio had not adopted them. Mr. Di Giorgio is not entitled to the claimed dependency exemptions.

III.     *Additions to Tax and Penalties*

A.     *Burden of Proof and Production*

The Commissioner determined additions to tax under section 6651(a)(1) and fraud penalties under section 6663.[3] The Commissioner bears the burden of production with respect to additions to tax and penalties and must produce evidence that they are appropriate. *See* I.R.C. § 7491(c); *Higbee v. Commissioner*, 116 T.C. 438, 446–47 (2001). For section 6663 fraud penalties, however, the Commissioner must

---

[3] The Commissioner determined penalties under section 6662 as an alternative. We need not reach this issue because we conclude that section 6663 applies. *See* Treas. Reg. § 1.6662-2(c) (explaining that where more than one penalty could apply to a portion of an underpayment, penalties do not stack, and only the maximum potentially applicable penalty applies).

**[\*22]** prove fraud by clear and convincing evidence. Rule 142(b); *see* I.R.C. § 7454(a); *Castillo v. Commissioner*, 84 T.C. 405, 408 (1985). Such a showing would generally shift the burden to the Di Giorgios to come forward with persuasive evidence that the determination is incorrect or that they had reasonable cause. *See Higbee*, 116 T.C. at 447. Where applicable, the Commissioner must produce evidence of managerial penalty approval under section 6751(b)(1). *See Walquist v. Commissioner*, 152 T.C. 61, 68 (2019).

B.      *Penalty Approval*

Section 6751(b)(1) generally requires managerial approval of certain penalties before assessment, including section 6663 penalties.[4] Thus, the Commissioner must produce evidence of compliance with section 6751(b)(1), which provides that that no penalty shall be assessed unless the initial determination of the penalties is approved (in writing) by the immediate supervisor of the person who made that determination. An "initial determination" occurs the earlier of when the Commissioner issues a notice of deficiency or formally communicates a decision to determine penalties. *Belair Woods, LLC v. Commissioner*, 154 T.C. 1, 14–15 (2020); *Clay v. Commissioner*, 152 T.C. 223, 248–49 (2019), *aff'd*, 990 F.3d 1296 (11th Cir. 2021).

An appeal of these cases would lie with the Eleventh Circuit, which has held that approval at any time before assessment satisfies the statute. *See Kroner v. Commissioner*, 48 F.4th 1272, 1276 (11th Cir. 2022), *rev'g in part* T.C. Memo. 2020-73. We follow clearly established law of the circuit in which a case before us is appealable. *Golsen v. Commissioner*, 54 T.C. 742, 756–58 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971). Thus, we follow *Kroner* here. The Commissioner satisfied *Kroner*'s standard because the penalties have been approved and have not yet been assessed.

Even under our more stringent precedent, however, section 6751(b)(1) is satisfied. *See Clay*, 152 T.C. 223. The revenue agent proposed section 6663 penalties in examination reports that were mailed to the Di Giorgios (on June 15, 2011) with 30-day letters signed by the revenue agent's immediate supervisor. In *Clay*, we held that an examination report that is attached to a 30-day letter and proposes section 6663 penalties can embody the initial determination. *Id.* at 249.

---

[4] Section 6751(b)(2) provides that the general rule of section 6751(b)(1) does not apply to any addition to tax under section 6651.

**[\*23]** Where the relevant supervisor has signed such a 30-day letter, section 6751(b)(1) is satisfied. *See Belanger v. Commissioner*, T.C. Memo. 2020-130, at \*27–28; *see also TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th 1354, 1373–74 (11th Cir. 2021). The letters were mailed on June 15, 2011, before the notices of deficiency, so they satisfy section 6751(b)(1).

C. *Section 6651(a)(1)*

Section 6651(a)(1) imposes an addition to tax for failure to file a return on or before the due date (including extensions) unless the taxpayer can establish that such failure was "due to reasonable cause and not due to willful neglect." To demonstrate reasonable cause, a taxpayer must show that he exercised ordinary business care and prudence but was nevertheless unable to file on time. *United States v. Boyle*, 469 U.S. 241, 246 (1985); Treas. Reg. § 301.6651-1(c)(1).

The Commissioner produced evidence of late filing, which Mr. Di Giorgio does not dispute. Despite placing the additions to tax at issue, Mr. Di Giorgio does not argue on brief that his late filing was due to reasonable cause and not willful neglect. At trial, he testified that he had a difficult time when his wife died, saying that he was a "vegetable" and "wasn't able to handle [his] business affairs." However, he was able to arrange international travel in the weeks immediately following his first wife's death, and he continued operating Radius CA. Although the death of a taxpayer's immediate family member may constitute reasonable cause in certain circumstances, a taxpayer's selective inability to meet his tax obligations when he can otherwise carry on normal activities does not excuse late filing. *Boyle*, 469 U.S. at 243 n.1; *Wilkinson v. Commissioner*, T.C. Memo. 1997-410, 74 T.C.M. (CCH) 566, 571. The record does not support a finding that Mr. Di Giorgio acted with reasonable cause and not willful neglect. *See* Rule 151(e)(4) and (5); *Petzoldt*, 92 T.C. at 683.

D. *Section 6663*

Section 6663 imposes a penalty of 75% of an underpayment of tax if any part of the underpayment is due to fraud. Once the Commissioner establishes that part of an underpayment is due to fraud, the entire underpayment is treated as attributable to fraud, except to the extent the taxpayer establishes otherwise. I.R.C. § 6663(b). The existence of fraud is a factual question to be resolved by considering the entire record. *See DiLeo*, 96 T.C. at 874. The Commissioner must prove two

**[\*24]** elements of fraud by clear and convincing evidence: (1) an underpayment of tax and (2) fraudulent intent. *Castillo*, 84 T.C. at 408–09. The Commissioner's burden applies separately for each of the years in issue. *Id.* at 409; *see* I.R.C. § 7454(a); Rule 142(b).

An underpayment is the amount by which the tax imposed by Title 26 exceeds the amounts shown as the tax by the taxpayer on his return. I.R.C. § 6664(a). The Commissioner established by clear and convincing evidence that Mr. Di Giorgio reported less tax than he owed for each year in issue, resulting in underpayments.

We can infer fraudulent intent from circumstantial evidence, the weight of which may vary depending on the taxpayer's sophistication. *See Clark*, T.C. Memo. 2021-114, at \*36–37. Mr. Di Giorgio was a sophisticated businessman. He sold houses, ran a mortgage-lending business, and sold mortgage-backed securities. He had employees and agents and dealt with banks, title companies, homebuyers, and the federal government.

Various "badges of fraud" may indicate fraudulent intent. *Niedringhaus v. Commissioner*, 99 T.C. 202, 211 (1992); *Clark*, T.C. Memo. 2021-114, at \*37. The existence of any one badge is not dispositive, but multiple badges together are strong circumstantial evidence of fraudulent intent. *Niedringhaus*, 99 T.C. at 211. Badges of fraud include, but are not limited to: (1) failing to file tax returns, (2) underreporting income, (3) keeping inadequate records, (4) giving implausible or inconsistent explanations of behavior, (5) failing to cooperate with tax authorities, (6) concealing income or assets, (7) engaging in illegal activities, (8) demonstrating a lack of credibility, (9) filing false documents (including false tax returns), and (10) dealing in cash. *See, e.g., id.*; *Kohan v. Commissioner*, T.C. Memo. 2019-85, at \*17–18.

### 1.    *Failing to File Returns*

Mr. Di Giorgio failed to file a corporate income tax return for Radius CA for 2006 or 2007, and the Commissioner argues that his failure supplies evidence of fraudulent intent. Despite that failure, Mr. Di Giorgio reported losses flowing from Radius CA on his individual income tax return for 2006 and included an employer identification number for Radius CA. Furthermore, he filed individual income tax returns for 2005 through 2007. This badge is neutral.

[*25]     2.     *Underreporting Income*

A pattern of substantially underreporting income over several successive years can be strong evidence of fraudulent intent. *See Zhadanov v. Commissioner*, T.C. Memo. 2002-104, 83 T.C.M. (CCH) 1553, 1560. Such a pattern evinces fraudulent intent "even where the record is 'devoid of the usual indicia of fraud.'" *Isaacson v. Commissioner*, T.C. Memo. 2020-17, at *48–49 (quoting *Otsuki v. Commissioner*, 53 T.C. 96, 107–08 (1969)), *aff'd*, 129 A.F.T.R.2d 2022-797 (9th Cir. 2022). Mr. Di Giorgio underreported his income for all three years in issue by millions. This badge provides strong evidence of fraudulent intent for each year.

3.     *Maintaining Inadequate Records*

Taxpayers must maintain records sufficient to determine their tax liability, and a failure to do so can indicate fraudulent intent. I.R.C. § 6001; *Bradford v. Commissioner*, 796 F.2d 303, 307–08 (9th Cir. 1986), *aff'g* T.C. Memo. 1984-601. Mr. Di Giorgio failed to produce adequate books and records for any of his activities, and the Commissioner had to resort to a bank deposits analysis. This can be evidence of fraudulent intent. *See Purvis v. Commissioner*, T.C. Memo. 2020-13, at *38. Mr. Di Giorgio also failed to produce business records or substantiation to the Commissioner or the Court, and his explanations regarding his records (or lack thereof) were not credible. Considering Mr. Di Giorgio's sophistication, we infer that he did not maintain the required records or that any records he maintained would have been unfavorable to his claims. *See Evans v. Commissioner*, T.C. Memo. 2010-199, 100 T.C.M. (CCH) 215, 219, *aff'd*, 507 F. App'x 645 (9th Cir. 2013). This badge provides evidence of fraudulent intent for each year in issue.

4.     *Implausible or Inconsistent Explanations*

A taxpayer's implausible or inconsistent explanations for his actions may constitute evidence of fraudulent intent. *See Bradford v. Commissioner*, 796 F.2d at 307. We may consider a taxpayer's filings and testimony as evidence of implausible or inconsistent explanations. *See Goldston v. Commissioner*, T.C. Memo. 2011-9, 101 T.C.M. (CCH) 1026, 1028.

Mr. Di Giorgio offered implausible and inconsistent testimony. His testimony about his lifestyle during the years in issue was inconsistent with the documentary record and Ms. Di Giorgio's testimony. His testimony about the Russell statement, which allegedly

[*26] pertains to a 2005 income item, was internally inconsistent and inconsistent with his argument on brief. His testimony regarding vehicle expenses was inconsistent with Ms. Di Giorgio's testimony. His argument on brief that he relied on a certified public accountant in 2005 is inconsistent with his testimony that he did not use an accountant during the years in issue, and it is inconsistent with the returns themselves, which all indicate he prepared them himself. This badge supplies evidence of fraud for each year in issue.

### 5. *Failing to Cooperate with Tax Authorities*

A taxpayer's failure to cooperate with tax authorities, including his failure to cooperate with revenue agents during an examination, can indicate fraudulent intent. *Grosshandler v. Commissioner*, 75 T.C. 1, 19–20 (1980). "[M]isleading statements during an audit, even from an unsophisticated taxpayer, may indicate fraudulent intent." *Clark*, T.C. Memo. 2021-114, at *37.

Mr. Di Giorgio failed to cooperate with tax authorities. He missed meetings with the revenue agent and made it difficult to contact him. He generally failed to provide requested documents and provided unreliable and false documents to substantiate his income and expenses. *See Le v. Commissioner*, T.C. Memo. 2020-27, at *35–36; *Energy Rsch. & Generation, Inc. v. Commissioner*, T.C. Memo. 2011-45, 101 T.C.M. (CCH) 1205, 1216–17. He informed the Commissioner of only one bank account and a few property sales, whereas the Commissioner found many more through summonses. *See Curtis v. Commissioner*, T.C. Memo. 2013-12, at *15–16, *aff'd*, 648 F. App'x 689 (9th Cir. 2016) (finding refusal to cooperate such that the Commissioner had to summon banks and title companies to obtain information was a badge of fraud). This badge provides evidence of fraudulent intent for each year in issue.

### 6. *Concealing Income*

If a taxpayer conceals his ownership of assets or covers up sources of income, such concealment supports a finding of fraud. *Spies v. United States*, 317 U.S. 492, 499 (1943). A taxpayer may conceal his income by revealing some bank accounts but not others during an audit or by using business bank accounts to pay personal living expenses. *Hovind v. Commissioner*, T.C. Memo. 2012-281, at *51–52; *Energy Rsch. & Generation, Inc.*, 101 T.C.M. (CCH) at 1216; *see Vanover v. Commissioner*, T.C. Memo. 2012-79, 103 T.C.M. (CCH) 1418, 1422–23.

**[\*27]** Mr. Di Giorgio concealed income. He failed to disclose all but one of his bank accounts. He used Radius CA's bank accounts to pay personal expenses, but Radius CA did not report paying him wages or issue him Forms 1099, and he did not report all the income he received from Radius CA on his returns. Meanwhile, he offset Radius CA's income for 2005 with erroneous deductions and reported a Schedule E loss for 2006 without filing Form 1120S or otherwise documenting Radius CA's income and expenses. *See Purvis*, T.C. Memo. 2020-13, at \*40–41 (finding this badge favored a finding of fraud where taxpayers used their business to pay personal expenses such as mortgages, car loans, and personal credit cards, but the business did not issue Forms W–2 or Forms 1099, and they did not report those amounts as income, so they concealed its receipt). For each year in issue, he omitted substantial income from Radius FL, which issued him a Form W–2 but was not part of the examination. He attempted to conceal Radius FL as a source of income by attaching a substitute Form W–2 to his return and listing himself as his employer instead of Radius FL. This was a deliberate attempt to conceal income, which provides evidence of fraud. This badge supplies evidence of fraud for each year in issue.

### 7. *Engaging in Illegal Activities*

Engaging in illegal activities, even if the taxpayer is not charged with a crime, is circumstantial evidence of fraud. *Niedringhaus*, 99 T.C. at 211; *Hovind*, T.C. Memo. 2012-281, at \*54–55. Mr. Di Giorgio and Radius CA earned income in 2005 and 2006 by violating securities laws. *See Meier v. Commissioner*, 91 T.C. 273, 302–03 (1988) (finding "lack of potential for criminal punishment or penalty" was "a distinction without a difference" where a taxpayer reaped ill-gotten gains by breaching fiduciary duties to his employer, but no criminal charges were filed). They obtained profits of at least $1,427,095 through fraud. Mr. Di Giorgio failed to report at least some of those profits; in 2006, he failed to file a corporate return for Radius CA and reported a net loss from Radius CA on his Form 1040. Thus, he failed to report income earned through illegal, fraudulent activities. This badge provides evidence of fraudulent intent for 2005 and 2006.

### 8. *Lack of Credibility*

Mr. Di Giorgio's testimony was not credible. It was inconsistent with other witnesses' testimony and the documentary record. We have addressed myriad inconsistencies. The contrast between his actual lifestyle and the lifestyle he claimed to lead particularly discredits him

**[\*28]** given the weight of evidence. This badge provides evidence of fraudulent intent for each year in issue.

### 9.    *Filing False Documents*

Filing false documents indicates a taxpayer's intent to evade income tax. *See Harrington v. Commissioner*, T.C. Memo. 2021-95, at \*40, *aff'd*, No. 22-9000, 2022 WL 17333080 (10th Cir. Nov. 30, 2022). That includes filing a return that omits income or contains a false response. *See id.* at \*39–40. Mr. Di Giorgio filed false returns for each year in issue. All the returns at issue omitted substantial income. Moreover, he reported rental real estate losses on property that was used by family for personal purposes. He also submitted false documents during the examination, including fabricated invoices for expenses and a fabricated statement as to ownership of an entity. This badge supplies evidence of fraudulent intent for each year in issue.

### 10.    *Conclusion as to Fraud Penalty*

For each year in issue, the Commissioner established by clear and convincing evidence that Mr. Di Giorgio underpaid his taxes and that those underpayments were due to fraud. The section 6663 penalty applies.

## IV.    *Innocent Spouse Relief*

Finally, we address whether Ms. Di Giorgio is entitled to innocent spouse relief under section 6015 for 2007. The Commissioner concedes that Ms. Di Giorgio is entitled to relief under section 6015(f). On brief, the Commissioner more specifically concedes that Ms. Di Giorgio is entitled to relief because "[w]hen she signed the 2007 individual income tax return, she lacked the sophistication to have reason to know of the understatements at issue in this case, it would be an undue financial hardship for her to be denied relief, and denying her relief would be inequitable given her circumstances." Mr. Di Giorgio opposes relief.

### A.    *General Rules*

Generally, married taxpayers may elect to file a joint federal income tax return. I.R.C. § 6013(a). Upon electing to file jointly, each spouse is jointly and severally liable for the entire tax due for that year. I.R.C. § 6013(d)(3). In certain circumstances, however, a spouse who filed a joint return may seek relief from joint and several liability under the procedures in section 6015. I.R.C. § 6015(a). Section 6015(a) allows

**[*29]** a spouse to seek relief from joint and several liability under subsection (b) or, if eligible, to allocate the liability according to subsection (c). If a taxpayer does not qualify for relief under subsection (b) or (c), the taxpayer may be eligible for equitable relief under subsection (f).

The taxpayer generally bears the burden of proving that he or she is entitled to section 6015 relief. Rule 142(a); *Alt v. Commissioner*, 119 T.C. 306, 311 (2002), *aff'd*, 101 F. App'x 34 (6th Cir. 2004). However, if the Commissioner concedes that the taxpayer is entitled to relief and the nonrequesting spouse opposes relief, it is an open question of whether the burden shifts to the nonrequesting spouse. *See Stergios v. Commissioner*, T.C. Memo. 2009-15, 97 T.C.M. (CCH) 1057, 1059. Because the evidence clearly weighs in favor of relief, we do not need to decide who bears the burden. *See id.* The scope and standard of our review in cases involving relief from joint and several income tax liability are de novo. *Porter v. Commissioner*, 132 T.C. 203, 210 (2009).

B.    *Section 6015(b)*

Section 6015(b)(1) provides that a requesting spouse is entitled to relief if all five of the following requirements are satisfied: (A) a joint return was filed for the taxable year; (B) there was an understatement of tax attributable to an erroneous item of the nonrequesting spouse; (C) at the time of signing the return, the requesting spouse did not know and did not have reason to know of the understatement; (D) taking into account all the facts and circumstances, it is inequitable to hold the requesting spouse liable for the deficiency in tax attributable to the understatement; and (E) the requesting spouse sought relief within two years of the first collection activity relating to the liability. *Alt*, 119 T.C. at 313.

Three requirements are clearly satisfied. The Di Giorgios filed a joint return, the understatement is attributable to erroneous items of Mr. Di Giorgio, and because the Commissioner has not commenced collection action, Ms. Di Giorgio's request was timely. Thus, she will qualify for relief if she satisfies section 6015(b)(1)(C) (knowledge requirement) and section 6015(b)(1)(D) (inequity requirement). We look at cases interpreting former section 6013(e)(1) when analyzing parallel provisions of section 6015. *See Korchak v. Commissioner*, T.C. Memo. 2006-185, 92 T.C.M. (CCH) 199, 213. The requirements in section 6015(b)(1)(C) and (D) are "virtually identical to" the requirements of former section 6013(e)(1)(C) and (D), so cases analyzing the latter are

[*30] instructive here. *Crouse v. Commissioner*, T.C. Memo. 2011-97, 101 T.C.M. (CCH) 1456, 1468; *Doyel v. Commissioner*, T.C. Memo. 2004-35, 87 T.C.M. (CCH) 960, 965.

### 1. *Knowledge Requirement*

Ms. Di Giorgio must have lacked actual or constructive knowledge of the understatement when she signed the 2007 return. The main contributors to the understatement were unreported income (including retirement account distributions, dividends, and $1,409,068 of general unreported income), disallowed itemized deductions totaling $51,532, and disallowed losses from Schedule E rental real estate activities totaling $36,939. We analyze Ms. Di Giorgio's knowledge of these items.

### a. *Actual Knowledge*

The regulations define actual knowledge. Treas. Reg. § 1.6015-3(c). Actual knowledge of omitted income means knowledge that the amount of income was received. Treas. Reg. § 1.6015-3(c)(2)(i)(A), (ii), (4) (example 4). Actual knowledge of erroneous deductions or credits generally means knowledge of the facts that made the item not allowable. *Id.* subdiv. (i)(B)(1). If the deduction was fictitious or inflated, actual knowledge means knowledge that the expenditure was not incurred or not incurred to the extent reported. *Id.* subdiv. (i)(B)(2). Knowledge of an erroneous item's source alone is insufficient. Treas. Reg. § 1.6015-3(c)(2)(iii).

Ms. Di Giorgio did not know of the unreported income and erroneous deductions. She did not have access to the accounts included in the bank deposits analysis, and there is no evidence that she knew about the unreported income that was deposited in them. All she knew about Mr. Di Giorgio's business was that he sold houses. Radius CA only sold one house in 2007 (to Mr. Di Giorgio), and Ms. Di Giorgio did not know whether Mr. Di Giorgio or Radius CA owned the home during the years in issue. Even though her name was used to sign the corporate warranty deed, she did not recognize her signature or know what the document was. Mr. Di Giorgio deposited the proceeds from the sale, most of which he borrowed, in his separate bank account.

### b. *Constructive Knowledge*

A requesting spouse has constructive knowledge of an understatement if a reasonably prudent taxpayer in her position at the time she signed the return could be expected to know that (1) the tax

**[\*31]** liability stated was erroneous or (2) that further inquiry was warranted. *Kistner v. Commissioner*, 18 F.3d 1521, 1525 (11th Cir. 1994) (citing *Stevens v. Commissioner*, 872 F.2d 1499, 1505 (11th Cir. 1989), *aff'g* T.C. Memo. 1988-63), *rev'g* T.C. Memo. 1991-463; *Hopkins v. Commissioner*, 121 T.C. 73, 77–78 (2003); Treas. Reg. § 1.6015-2(c). A "duty of inquiry" arises where the circumstances put the requesting spouse on notice of *the possibility* of an understatement. *Jacobsen v. Commissioner*, T.C. Memo. 2018-115, at \*14, *aff'd*, 950 F.3d 414 (7th Cir. 2020). The requesting spouse has constructive knowledge where the duty is triggered but not discharged. *Id.* at \*14–15. We generally apply the same circumstantial test to determine whether the requesting spouse had a reason to know or duty to inquire (which are both forms of constructive knowledge). *Kistner v. Commissioner*, 18 F.3d at 1525; *Jacobsen*, T.C. Memo. 2018-115, at \*15.

Whether a requesting spouse has constructive knowledge is a subjective test and depends on the circumstances. *See Podlucky v. Commissioner*, T.C. Memo. 2022-45, at \*25; Treas. Reg. § 1.6015-2(c). We consider the following factors: (1) the requesting spouse's level of education; (2) the requesting spouse's involvement in the family's business and financial affairs; (3) the presence of expenditures that appear lavish or unusual when compared to the family's past standard of living; and (4) the nonrequesting spouse's evasiveness and deceit about the family's finances. *Stevens*, 872 F.2d at 1505.[5]

i.     *Level of Education*

Ms. Di Giorgio had a high school education and completed some college nursing courses in the Philippines. From her testimony at trial, nearly 15 years after the years in issue, it was evident that English is not her first language. She had no business or accounting background. *See Taft*, T.C. Memo. 2017-66, at \*7 (deciding this factor in favor of a taxpayer with a degree in nursing but no business background). We have frequently decided this factor in favor of taxpayers who lack education in business, accounting, or tax, even if the taxpayer is highly educated.

---

[5] *Stevens* predated section 6015(b), but we continued applying *Stevens* after section 6015(b) and regulations thereunder were enacted. *See, e.g., Taft v. Commissioner*, T.C. Memo. 2017-66, at \*6–9. The regulations identify six nonexclusive factors that are relevant to the constructive knowledge inquiry that largely overlap with the factors laid out in *Stevens*. *See Jacobson*, T.C. Memo. 2018-115, at \*16; Treas. Reg. § 1.6015-2(c).

**[\*32]** *Wang v. Commissioner*, T.C. Memo. 2014-206, at \*20. This factor weighs in Ms. Di Giorgio's favor.

> ii. *Involvement in Business and Financial Affairs*

Ms. Di Giorgio's involvement in the family's business and financial affairs was limited. She did not work in 2007 and knew little about Mr. Di Giorgio's business activities. They did not share accounts, and Mr. Di Giorgio gave her money as needed. She was not primarily responsible for making financial decisions or managing household expenses. She played no role in preparing the 2007 return and had never seen a U.S. tax return before the year she signed it. We have decided this factor in favor of taxpayers who were more involved than Ms. Di Giorgio. *See, e.g.*, *Juell v. Commissioner*, T.C. Memo. 2007-219, 94 T.C.M. (CCH) 143, 147–48 (finding involvement limited to paying routine bills out of joint account); *Hinds v. Commissioner*, T.C. Memo. 1988-426, 56 T.C.M. (CCH) 104, 106 (finding extent of involvement was accepting money from the nonrequesting spouse to pay household expenses and purchase food and clothing). This factor weighs in her favor.

> iii. *Lavish Expenditures*

Ms. Di Giorgio acknowledges that her standard of living improved because of her relationship with Mr. Di Giorgio.[6] However, the relevant question is whether any of their expenditures in 2007 were lavish or unusual compared to their past spending habits. *See Hinds*, 56 T.C.M. (CCH) at 106 (deciding this factor in favor of a taxpayer who consistently lived an affluent lifestyle throughout her marriage). In addressing this question, we bear in mind that Ms. Di Giorgio's frame of reference is quite short. She met Mr. Di Giorgio in person in January 2006, moved in with him in July 2006, and married him in September 2006. During that time, he received over $1 million of nontaxable life insurance proceeds from the recent death of his first wife. From 2006 to 2007, their standard of living did not fluctuate. No expenditures were lavish in comparison to her prior experience with Mr. Di Giorgio. This factor weighs in her favor.

---

[6] Mr. Di Giorgio argues that we should take her testimony about their lifestyle with a grain of salt "given just one year earlier she lived in a third world country without reliable electric or running water."

**[\*33]**                    iv.    *Mr. Di Giorgio's Evasiveness and Deceit*

Mr. Di Giorgio was evasive and deceptive. He was not forthright with Ms. Di Giorgio about his legal issues, and during the years in issue, Ms. Di Giorgio was unaware of them. When he gave her the signature page of the return, he refused to tell her what it was and belittled her by telling her she would not understand. She was genuinely naive and trusted her husband, but she discovered that he did not have her best interest in mind after the years in issue. This factor weighs in her favor.

v.    Constructive Knowledge Conclusion

On the basis of the factors above, Ms. Di Giorgio could not be expected to know that the tax liability stated on the return was erroneous or that further investigation was warranted. Mr. Di Giorgio gained her commitment and trust, then began mistreating her (verbally and emotionally) when she left her home country to marry him. He was controlling and evasive, but despite his behavior, she had no reason to question him financially, because she believed he was successful and was unaware of his legal problems. He pressured her into signing returns without seeing them, but even if she had, it would have been difficult for her to question him. She had no business or financial background, little knowledge about the business, and no access to the relevant financial records. Ms. Di Giorgio lacked constructive knowledge.

2.    *Inequity Requirement*

We consider all the facts and circumstances in determining whether it is inequitable to hold a requesting spouse jointly and severally liable. I.R.C. § 6015(b)(1)(D); *see* Treas. Reg. § 1.6015-2(d). We consider factors utilized in determining "inequity" in the context of section 6015(f). *See Juell*, 94 T.C.M. (CCH) at 148. For guidance, we may look to, but are not bound by, Revenue Procedure 2013-34, 2013-43 I.R.B. 397. *Parker v. Commissioner*, T.C. Memo. 2022-110, at \*5 (citing *Pullins v. Commissioner*, 136 T.C. 432, 438–39 (2011)). The revenue procedure outlines the following nonexclusive factors: (a) marital status; (b) whether the requesting spouse will suffer economic hardship absent relief; (c) whether the requesting spouse had actual or constructive knowledge of the understatement; (d) whether either spouse had a legal obligation to pay the liability; (e) whether the requesting spouse significantly benefited from the understatement; (f) whether the requesting spouse has made a good faith effort to comply with income

[*34] tax laws in years following the year of the understatement; and (g) whether the requesting spouse was in poor physical or mental health when the joint return was filed. Rev. Proc. 2013-34, § 4.03, 2013-43 I.R.B. at 400–03. We perform a balancing analysis of these factors below.

### a. *Marital Status*

If the requesting spouse is no longer married to the nonrequesting spouse, this factor weighs in favor of relief. *Id.* § 4.03(2)(a), 2013-34 I.R.B at 400; *see Hollimon v. Commissioner*, T.C. Memo. 2015-157, at *10–11. A requesting spouse is treated as "no longer married" if she is divorced or legally separated from the nonrequesting spouse, or if she has not been a member of the same household at any time during the 12-month period preceding the determination. Rev. Proc. 2013-34, § 4.03(2)(a). Ms. Di Giorgio has not been a member of the same household as Mr. Di Giorgio, whom she is divorcing, since 2019. This factor weighs in favor of relief.

### b. *Economic Hardship*

If denying relief from the joint and several liability will cause the requesting spouse to suffer economic hardship, this factor weighs in favor of relief. The requesting spouse will suffer economic hardship if paying all or part of the liability would render the requesting spouse unable to pay reasonable basic living expenses. *Id.* § 4.03(2)(b), 2013-43 I.R.B. at 401. A relevant consideration in determining economic hardship is the requesting spouse's income compared to the federal poverty level. *See* 42 U.S.C. § 9902(2). If the requesting spouse's income is below 250% of this amount, the factor weighs in favor of relief unless she has assets from which she can pay the tax liability while still meeting her basic living expenses. Rev. Proc. 2013-34, § 4.03(2)(b). At the time of trial in 2021, 250% of the federal poverty level for a family of three in Florida was $54,900 ($21,960 × 250%). *See* Annual Update of the HHS Poverty Guidelines, 86 Fed. Reg. 7732, 7733 (Feb. 1, 2021).

Ms. Di Giorgio earns $15 per hour, but her hours fluctuate depending on whether she is assigned to a client. At the time of trial, she was not working because her client had recently died. However, Ms. Di Giorgio has reported monthly income as high as $3,100, which when annualized falls well below the federal poverty level. Further, she has limited assets and significant liabilities, and her monthly reasonable basic living expenses exceed her monthly income. Paying any part of the

**[\*35]** 2007 liability would cause Ms. Di Giorgio to suffer significant hardship. This factor weighs in favor of relief.

### c. *Knowledge or Reason to Know*

If the requesting spouse had knowledge or reason to know about the understatement in signing the return, this factor weighs against relief. Actual knowledge under Revenue Procedure 2013-34 is the same as under section 6015(b). *See Freman v. Commissioner*, T.C. Memo. 2023-10, at \*26. Constructive knowledge essentially considers the same facts and circumstances discussed above. *See* Rev. Proc. 2013-34, § 4.03(2)(c)(iii), 2013-43 I.R.B. at 402. Ms. Di Giorgio lacked actual or constructive knowledge of the understatement when she signed the return. This factor weighs in favor of relief.

### d. *Legal Obligation*

If the nonrequesting spouse has the sole legal obligation to pay the outstanding income tax liability pursuant to a divorce decree or agreement, this factor weighs in favor of relief. If the spouses are not separated or divorced, or the divorce decree or agreement is silent as to such obligation, this factor is neutral. At the time of trial, neither spouse had the sole legal obligation. This factor is neutral.

### e. *Significant Benefit*

A "significant benefit" is any benefit exceeding normal support, such as luxury assets and expensive vacations. *Id.* § 4.03(2)(e), 2013-43 I.R. B. at 402; *see also* Treas. Reg. § 1.6015-2(d). If the requesting spouse significantly benefited from the omitted income, this factor weighs against relief. Rev. Proc. 2013-34, § 4.03(2)(e); *see also* Treas. Reg. § 1.6015-2(d). If the nonrequesting spouse controlled the household and business finances or there was abuse such that the nonrequesting spouse made the decision on spending funds for a lavish lifestyle, then this mitigates this factor so that it is neutral. *See* Rev. Proc. 2013-34, § 4.03(2)(e). According to Revenue Procedure 2013-34, § 4.03(2)(c)(iv), 2013-43 I.R.B. at 402, "[a]buse comes in many forms and can include physical, psychological, sexual, or emotional abuse, including efforts to control, isolate, humiliate, and intimidate the requesting spouse, or to undermine the requesting spouse's ability to reason independently and be able to do what is required under the tax laws."

Ms. Di Giorgio benefited from the understatement only to the extent of the Di Giorgios' shared lifestyle, and Mr. Di Giorgio completely

**[\*36]** controlled family finances. He would have lived the same lifestyle regardless of whether Ms. Di Giorgio was part of it, and Ms. Di Giorgio reaped no individual benefit. This factor is neutral.

### f. *Compliance with Tax Laws*

The requesting spouse's good faith efforts to comply with income tax laws in the years following the year to which her request relates weigh in favor of relief. To the extent the requesting spouse continued filing joint returns with the nonrequesting spouse, the factor is neutral. There is no evidence in the record regarding Ms. Di Giorgio's compliance with tax laws after 2007, so this factor is neutral.

### g. *Physical and Mental Health*

If the requesting spouse was physically or mentally ill when she signed the joint return, this factor weighs in favor of relief. If not, this factor is neutral. Ms. Di Giorgio did not have any mental or physical health problems when she signed the returns, so this factor is neutral.

### h. *Inequity Conclusion*

Of the factors above, three weigh in favor of relief, and four are neutral. She lacked knowledge of Mr. Di Giorgio's fraudulent reporting and unreported income, she has been living apart from him since 2019 and is divorcing him, and paying the liabilities would be a significant economic hardship for her. Given the circumstances, it would be inequitable to deny her relief.

### C. *Conclusion as to Innocent Spouse Relief*

Ms. Di Giorgio is entitled to innocent spouse relief for 2007 because she has demonstrated that she satisfies the requirements of section 6015(b).

## V. *Conclusion*

Mr. Di Giorgio failed to prove any error in any of the Commissioner's determinations beyond the concessions already made by the Commissioner. The Commissioner proved by clear and convincing evidence that those underpayments were attributable to fraud. Ms. Di Giorgio is entitled to innocent spouse relief under section 6015 for 2007. Accordingly, Mr. Di Giorgio is solely liable for an income tax

**[*37]** deficiency, a section 6651(a)(1) addition to tax, and a section 6663 penalty for each year in issue.

To reflect the foregoing and the parties' concessions,

*Decisions will be entered under Rule 155.*